**Robert W. WILSON, Plaintiff-Appellant,**

**v.**

**COMTECH TELECOMMUNICATIONS CORP., Fred Kornberg, J. Preston Windus, Jr., Donald R. Campbell, John E. Rosenblum, Milton L. Deever, and Gerard R. Nocita, Defendants-Appellees.**

**No. 599, Docket 80–7642.**

United States Court of Appeals, Second Circuit.

Argued Feb. 23, 1981.

Decided April 29, 1981.

Jack David, New York City (Steven Finell, Nancy F. Brodie, David & Finell, New York City, on the brief), for plaintiff-appellant.

Harry I. Rand, New York City (Amy Adelson, Paul Chessin, Botein, Hays, Sklar & Herzberg, New York City, on the brief), for defendants-appellees.

Before FEINBERG, Chief Judge, OAKES, Circuit Judge, and NEAHER, District Judge.[*]

OAKES, Circuit Judge:

This appeal, dealing with securities regulation, involves both an alleged failure by a corporation and its officers to correct informal financial projections and an alleged violation of the "disclose or abstain" rule relating to insider trading. Suit was brought by appellant Robert W. Wilson, a sophisticated professional investor, who in October 1976 attended a conference with other investors and securities analysts at which one of the appellees, Fred Kornberg, president of appellee corporation Comtech Telecommunications (Comtech), responded to several questions by offering projections of Comtech's sales and earnings for the coming fiscal year. Several months later, on March 10, 1977, Comtech released its financial report for the second quarter of fiscal 1977, revealing significant declines in both sales and earnings. In the meantime, between March 7 and 10, Wilson had purchased a substantial amount of Comtech stock and, according to his calculations, ultimately lost approximately $100,000.

Wilson brought this suit against Comtech and some of its officers under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, alleging that he purchased Comtech stock on the basis of misleading information supplied by appellees. He also claimed that both Comtech's acquisition of R.F. Systems, Inc., on February 8, 1977, by an exchange of stock, and the sale of Comtech stock in late January and early February by appellee J. Preston Windus, Jr., Comtech's treasurer and chief financial officer, constituted unlawful insider trading and provided an independent basis for liability. After a trial without jury, the United States District Court for the Southern District of New York, Gerard L. Goettel, Judge, dismissed the complaint. On appeal, Wilson argues that the projections in October 1976 were material statements, that the corporation and its officers had a duty to correct these statements once it became apparent that the projections were inaccurate, that these officers acted with scienter in failing to make such corrections, and that the misleading projections were significant causal factors in his decision to purchase Comtech stock. He also reasserts his claim on unlawful insider trading.

[*] Of the Eastern District of New York, sitting by designation.

We affirm the judgment below on the basis that Wilson did not rely on the informal financial projections in making his purchases of Comtech stock and that he had no standing to assert a claim of unlawful insider trading against appellees. We decline to reach the other issues raised in this appeal.

## I. FACTS

Appellant Wilson is a professional investor who manages his own investments as well as a small hedge fund. Appellee Comtech is a New York corporation which manufactures and sells telecommunications equipment and systems; the other appellees are officers of Comtech.[1] In mid-October 1976 Wilson attended the annual conference of the Western Electronics Manufacturers Association (WEMA) at which Comtech's president, Kornberg, held a series of small meetings with securities analysts, investors, and money managers to present information and answer questions about his company.[2] Prior to the WEMA conference, Comtech had released its report for fiscal 1976 which indicated record results, including a 40% increase over 1975 in sales and a 45% gain over 1975 in earnings per share. The only apparent cloud on the Comtech horizon was that the backlog of orders at the close of fiscal 1976 was only $9,867,665, down sharply from $23,096,292 at the end of fiscal 1975.[3] Believing that analysts would be greatly concerned about the backlog decline, Kornberg's presentations at the conference focused on reasons for the decline,

Comtech's potential markets, and the contracts on which it was currently bidding.

After each of Kornberg's presentations, he held a question and answer session. Questions at several of the small meetings arose concerning Comtech's expectations for future sales and earnings. As to Kornberg's response to these questions, the district court found:

Mr. Kornberg told the security analysts in answer to questions at the WEMA Conference meetings, including the one attended by plaintiff Wilson, that Comtech sales for the first half of Comtech's fiscal year ended July 31, '77 *would be flat* and that the second half *could be flat if* Comtech won new short term contracts in the next 30 to 60 days. Moreover, if additional large contracts were awarded soon, the fourth quarter may show growth.

. . . .

... Mr. Kornberg indicated at the 1976 WEMA Conference that Comtech's earnings for the first half of fiscal 1977 would be flat.

A. This was in response to questions and was not a part of Comtech's formal presentation;

B. The answers were reasonably believed by Comtech and by Mr. Kornberg to be true at the time made.

Mr. Kornberg indicated at the 1976 WEMA Conference that Comtech sales for the second half of fiscal 1977 would be flat. He also indicated that Comtech

1. At all relevant times appellee Fred Kornberg was president, chief executive officer, and a director, appellee J. Preston Windus, Jr., was secretary-treasurer and chief financial officer, appellee Donald R. Campbell was a vice president and a director, appellee John E. Rosenblum was a vice president and a director, appellee Milton L. Deever was a vice president, and appellee Gerard R. Nocita was assistant to the president and a director. All of the above were also stockholders of Comtech.

2. Kornberg was accompanied at the WEMA conference only by Deever.

3. Backlog is the value of all contracts in house on which sales have not yet been recorded. It is a highly significant figure for many companies because it represents sales that will be

recognized in future fiscal periods. But Comtech had made it clear in its reports to stockholders that:

Variations in backlog are primarily attributable to the rate of growth of that portion of the communications industry in which Comtech operates, the intensity and competitiveness of our marketing and proposal efforts, and the specific timing of contract awards. Backlog as of the end of a quarterly period is not necessarily indicative of the sales anticipated for the subsequent period due to, among other things, the specific delivery schedule associated with each contract and the possibility of contract cancellation (although to date none of the Company's contracts has been cancelled).

could maintain its fiscal 1976 level of earnings in fiscal 1977 on contracts already in backlog.

A. This was in response to questions and was not a part of Comtech's formal presentation;

B. The answers had a reasonable basis and were expressly qualified by statements also made by Mr. Kornberg, that in order to achieve those levels of earnings, Comtech would have to receive substantial new contracts and that the next 30 to 60 days were critical.

(Emphasis added.) Wilson did not purchase Comtech stock at that time.

On December 24, 1976, Comtech issued its first quarter report for fiscal 1977 (ending October 31, 1976) to shareholders. In a section headlined "Outlook," the report stated: "As can be seen from the accompanying statement, our profit position continues as strong as ever. The combination of a strong product line, a diversified business, modern facilities and new products in advanced stages of development gives us confidence for the future." Again, Wilson did not purchase Comtech stock at that time.

By the end of January 1977 it began to be apparent that Comtech would not achieve the results projected at the WEMA conference. First, sometime in mid-January, three customers requested deferments of substantial deliveries scheduled for the second quarter, thus preventing recognition of sales to them in that quarter under Comtech's method of accounting. Then on February 7, 1977, appellee Windus discovered that the contract value and backlog on a major contract, "Project 488," had through error been overstated by some $325,000, meaning that Comtech's profits on the job had also been overstated. In order to correct this, Comtech was compelled to record no profit on the $823,747 in sales recognized on Project 488 in the second quarter, thus reducing the earnings per share reported for the quarter by $.07. Finally, on February 8, 1977, Comtech closed a deal to acquire R.F. Systems, Inc., by exchanging over 51,000 shares of Comtech stock for stock of the acquired company. The addi-

tional costs associated with this acquisition, as well as those costs related to Comtech's move to a new building and its increased efforts in the area of research and development, all contributed to the second quarter decline. Meanwhile, between January 24 and February 7, Windus had sold 1,600 of his 1,800 shares of Comtech stock, but without knowledge of the Project 488 clerical errors.

On February 25, 1977, Comtech's monthly financial report for January 1977, setting forth the decline in sales and earnings, was distributed to all the appellees. However, Comtech's independent auditors had to review the second quarter results before they could be released to the public. This regular quarterly review began in late February and concluded on March 7. On March 8, 1977, Comtech's Audit Committee and Board of Directors approved the second quarter results, including the adjustment made because of the Project 488 errors. But Comtech delayed disclosure of the report for one day because its general counsel requested time to consider whether an explicit statement should be made with respect to these errors. Counsel decided by late afternoon on March 9 that no such statement was necessary and on the next morning Comtech released the operating results for the second quarter.

As already mentioned, Wilson had not purchased Comtech stock either after the WEMA conference or after reading the "Outlook" comment in the first quarter report of late December. He also was aware of Comtech's accounting methods and knew that Comtech's quarterly operating results were "historically erratic and volatile," though he was of the belief that the company's volatility had stabilized. On or about March 4, 1977, Comtech was again brought to Wilson's attention, this time by a broker, Fred Stein, during a luncheon conversation at the restaurant La Caravelle in Manhattan. Stein noted that the price of Comtech stock had declined and urged Wilson to buy now. Wilson reviewed his file on Comtech that afternoon, finding among his papers a

February 1977 "Research List" issued by Faherty & Swartwood, a market maker for the stock, projecting fiscal 1977 earnings of $1.50–$1.60 per share. Wilson then telephoned broker Thomas J. Burke of Faherty & Swartwood and asked whether its analyst, Faith Griffin, "still liked the stock." Burke said that she did and Wilson placed an order for 75,000 shares of Comtech stock at a price not to exceed $12.50 per share.[4] He placed this order despite knowing that the second quarter results were about to be released and without checking with Comtech's management. By March 10, when the second quarter results were released, Faherty & Swartwood had purchased 23,500 shares of Comtech for Wilson at a total cost of $293,375. Upon learning of Comtech's second quarter results, however, Wilson's brokers promptly stopped purchasing shares of Comtech for his account and, after consulting with Wilson, sold off his shares over the next six months.[5] The difference between what Wilson paid for the stock and what he received on selling it amounted to $99,946.45, and these are the damages he seeks.

## II. DISCUSSION

■■■ We begin with the issue of reliance. The element of reliance serves to restrict the potentially limitless thrust of rule 10b–5 to those situations in which there exists causation in fact between the defendant's act and the plaintiff's injury. *Titan Group, Inc. v. Faggen*, 513 F.2d 234, 238–39 (2d Cir.), *cert. denied*, 423 U.S. 840, 96 S.Ct. 70, 46 L.Ed.2d 59 (1975); *Globus v. Law Research Service, Inc.*, 418 F.2d 1276, 1292 (2d Cir. 1969), *cert. denied*, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970); *List v. Fashion Park, Inc.*, 340 F.2d 457, 462–63 (2d Cir.), *cert. denied*, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965).[6] However, the plaintiff is not required to prove that the defendant's act was the sole and exclusive cause of his injury; he need only show that it was " 'substantial,' *i. e.*, a significant contributing cause." *Herzfeld v. Laventhol, Krekstein, Horwath & Horwath*, 540 F.2d 27, 34 (2d Cir. 1976).[7]

**4.** Had this order been filled in its entirety, Wilson would have acquired just under 5% of Comtech's outstanding shares at a price of about $1 million.

**5.** In the words of the district court, "Wilson instructed his broker to sell these shares as promptly as could be done without further depressing the market price of the stock as a result of his own sales volume and relied on his broker to carry out these instructions based on the broker's judgment and market conditions."

**6.** The concepts of reliance and causation have often been used interchangeably in the context of rule 10b–5 cases. *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 495 F.2d 228, 239 (2d Cir. 1974). Indeed, in addressing the issue of reliance, courts have said that "the test is properly one of tort 'causation in fact.' " *Chasins v. Smith, Barney & Co.*, 438 F.2d 1167, 1172 (2d Cir. 1970); *see Herzfeld v. Laventhol, Krekstein, Horwath & Horwath*, 540 F.2d 27, 33–34 (2d Cir. 1976). Although we will speak primarily in terms of reliance, a distinction should be noted between cases involving affirmative misrepresentations and those involving nondisclosure. The concept of reliance in a case of affirmative misrepresentations embodies two separate questions: (1) Did the plaintiff *believe* what the defendant said, and (2) was this belief the *cause* of the plaintiff's action? R. Jennings & H. Marsh, *Securities Regulation* 1063 (4th ed. 1977). In a case of nondisclosure,

the task of positively proving reliance may become impossible to perform, and although the courts still refer to the element of causation in fact, the question really becomes one of materiality: "All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision," *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972); *see Titan Group, Inc. v. Faggen*, 513 F.2d 234, 239 (2d Cir.), *cert. denied*, 423 U.S. 840, 96 S.Ct. 70, 46 L.Ed.2d 59 (1974); *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 380–81 (2d Cir. 1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975). *See generally Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1301–03 (2d Cir. 1973).

**7.** In *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 380 (2d Cir. 1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975), this court spoke of the need for "a showing of both *loss causation*—that the misrepresentations or omissions caused the economic harm—and *transaction causation*—that the violations in question caused the appellant to engage in the transaction in question." In the instant case, as in *Schlick*, demonstration of the latter is the critical issue, as once this is done, the former is demonstrated rather easily by Wilson's proof of some form of economic dam-

In ruling against Wilson on the reliance issue in the instant case, the district court stated, as a finding of fact, that "[t]here is no showing by a preponderance of the credible evidence that Mr. Wilson purchased any shares of Comtech stock in reliance upon any misstatement of material fact made by any defendant." The court then ruled, as a matter of law, that Comtech's failure, prior to the March 10 quarterly report, to disclose business reverses and the Project 488 bookkeeping errors was not "the proximate cause of the plaintiff's harm." The court added "that none of the statements made at the 1976 WEMA conference or in the outlook section of the first quarterly report were determinative factors in the plaintiff's decision to purchase Comtech stock in March of 1977." Wilson disputes these statements by the district court on two grounds, arguing that (1) this is a nondisclosure case and causation in fact should be presumed without proof of reliance once the omitted facts are shown to be material;[8] and (2) even if this is a misrepresentation case, the lower court did not properly apply the "significantly contributing cause" test for proving reliance. We disagree with both of these contentions.

To be sure, under *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972), causation in fact may be established in the case of a nondisclosure if the information withheld is found to be material. But as Judge Waterman stated in referring to *Affiliated Ute*:

[T]he Court, rather than abolishing reliance as a prerequisite to recovery, was recognizing the frequent difficulty in *proving*, as a practical matter, that the alleged misrepresentation, allegedly relied upon, caused the injury.... Unlike instances of affirmative misrepresentation where it can be demonstrated that the injured party relied upon affirmative statements, in instances of total non-disclosure, as in *Affiliated Ute*, it is of

course impossible to demonstrate reliance
....

*Titan*, 513 F.2d at 238–39.

We have in the case at bar informal statements that earnings for the first half of fiscal 1977 "would be flat" and for the second half "could be flat" *if* certain contracts were obtained within thirty to sixty days after the statements were made, *i. e.,* by the end of December 1976. These statements were reasonable and were believed to be true when made. However, they later became misleading, if treated as current, when the company failed to disclose the new information that three customers had requested deferment of second quarter deliveries and that there had been an error in connection with Project 488. To characterize this, for purposes of establishing reliance, as either an omission or a misrepresentation case is to beg the question. In many instances, an omission to state a material fact relates back to an earlier statement, and if it is reasonable to think that that prior statement still stands, then the omission may also be termed a misrepresentation. The labels by themselves, therefore, are of little help. What is important is to understand the rationale for a presumption of causation in fact in cases like *Affiliated Ute*, in which no positive statements exist: reliance as a practical matter is impossible to prove. *See* 3 A. Bromberg & L. Lowenfels, *Securities Fraud & Commodities Fraud* § 8.6(1), at 209 ("In nondisclosure cases, reliance has little if any rational role"); Note, *The Reliance Requirement in Private Actions Under SEC Rule 10b–5*, 88 Harv.L. Rev. 584, 590 (1975). The situation here does not present that problem.

Throughout these proceedings, Wilson has emphasized the significance of the informal financial projections made at the October 1976 WEMA conference and the text of the "Outlook" section in the December 1976 first quarter report allegedly reaffirming the projections. It is the failure to correct these projections of which Wilson complains. If we assume, as Wilson argues,

---

age—the loss he suffered upon selling his shares of Comtech.

8. See note 6 *supra*.

that appellees had a duty to correct the projections once new information made them inaccurate, then, perforce, those statements were still current in March 1977 and Wilson must demonstrate that he relied on them in making his purchases of Comtech stock. But the district court, in its findings of fact, stated that Wilson did not rely upon any statement by appellees in purchasing his shares of Comtech, and the record clearly supports this finding. Wilson made no effort to confirm Kornberg's projections by finding out if, in fact, Comtech had won new short-term contracts in the thirty to sixty days following the WEMA conference. Rather, Wilson's renewed interest in Comtech, leading him to purchase, appears to have been stimulated by his luncheon with Stein at La Caravelle and his subsequent phone call to a broker at Faherty & Swartwood.

As for Wilson's argument that the district court, as a matter of law, did not properly apply the "significant contributing cause" test for reliance, *see Herzfeld*, 540 F.2d at 34, it is true that the trial judge spoke of "determinative factors." But the context in which the judge stated his conclusions indicates that he used the term "determinative factors" as synonymous with "substantial factors."

Because we find that Wilson has failed to demonstrate his reliance on any actions by appellees, we need not reach the other elements of his 10b–5 claim. We still must address, however, the argument that Comtech's acquisition of R.F. Systems, Inc., on February 8, 1977, by an exchange of stock, and the sale by Windus of some of his Comtech stock, between January 24 and February 7, provide an independent basis for liability under the insider trading "disclose.or abstain" rule.

■ This court announced the prohibition against trading on inside information in *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 848 (2d Cir. 1968) (en banc), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969): "[A]nyone in possession of material inside information must either disclose it to the investing public, or, if he is disabled from disclosing it . . ., or he chooses not to do so, must abstain from trading in or recommending the securities concerned while such inside information remains undisclosed." Although that case was an SEC injunctive action, the "disclose or abstain" rule also applies in private damage actions under section 10(b) and rule 10b–5. *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 495 F.2d 228, 236 (2d Cir. 1974). In the case at bar, the district court held that Wilson had no standing to allege that any of the appellees engaged in unlawful insider trading and that none of the appellees had a duty to disclose material inside information to Wilson or to abstain from trading. Wilson argues that the lower court erred in its holding because the sales of stock by Comtech and by Windus were made after it began to be apparent that Comtech's sales and earnings for the second quarter of fiscal 1977 would decline, and because Wilson's purchases of Comtech stock came before appellees disclosed this material inside information. We agree with the conclusion of the district court.

■ In *Shapiro*, 495 F.2d at 237, this court held insider sellers subject to a duty to disclose only to those who purchased the stock "during the same period" as the insiders' sales. To be sure, the district court on remand interpreted this language to refer to the period of time from the defendants' trades to the public disclosure of the insider information, *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, [1975–1976 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,377, at 98,878 (S.D.N.Y.1975), but the entire period in that case was only four days. To extend the period of liability well beyond the time of the insider's trading simply because disclosure was never made could make the insider liable to all the world. *See Shapiro*, 495 F.2d at 239; *Globus v. Law Research Service, Inc.*, 418 F.2d 1276, 1292 (2d Cir. 1969), *cert. denied*, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970). Any duty of disclosure is owed only to those investors trading contemporaneously with the insider; non-contemporaneous traders do not require the protection of the "dis-

close or abstain" rule because they do not suffer the disadvantage of trading with someone who has superior access to information. *See Fridrich v. Bradford*, 542 F.2d 307, 326 (6th Cir. 1976) (Celebrezze, J., concurring), *cert. denied*, 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 769 (1977). This court recently reiterated such a limitation on the scope of liability under rule 10b–5 for insiders trading in the open market:

> The knowing use by corporate insiders of non-public information for their own benefit or that of "tippees" by trading in corporate securities amounts to a violation of Rule 10b–5 ... which may give rise to a suit for damages by uninformed outsiders *who trade during a period of tippee trading.*

*Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 165 (2d Cir. 1980) (emphasis added) (citations omitted). Because, in the instant case, Wilson purchased his Comtech stock approximately one month after appellees' sales, he did not trade contemporaneously with the insiders and he has no standing to sue on this claim.

Judgment affirmed.