**Irving REISS, Plaintiff-Appellant,**

v.

**PAN AMERICAN WORLD AIRWAYS, INC., Defendant-Appellee.**

**No. 1134, Docket 83–7017.**

United States Court of Appeals, Second Circuit.

Argued April 18, 1983.

Decided June 29, 1983.

Arnold J. Ross, New York City (Goldfeld, Charak & Ross, New York City, of counsel), for plaintiff-appellant.

George Weisz, New York City (Cleary, Gottlieb, Steen & Hamilton, New York City, of counsel), for defendant-appellee.

Before LUMBARD, WINTER and PRATT, Circuit Judges.

WINTER, Circuit Judge:

Irving Reiss appeals from a judgment granting defendant Pan American World Airways, Inc.'s ("Pan Am") motion for summary judgment dismissing his class action complaint. The complaint alleged violations of section 10(b) and Rule 10b–5 of the Securities Exchange Act of 1934 ("Act"), 15 U.S.C. § 78j(b) (1976), and 17 C.F.R. 240.-10b–5 (1982). Plaintiffs, holders of Pan Am convertible debentures which were being called, sold the debentures rather than convert them into capital stock. They allege that if they had known at the time that Pan Am was attempting to negotiate a merger with National Airlines, Inc. ("National"), they would have converted the debentures into stock rather than selling them. In granting summary judgment upon a detailed stipulation of facts, Judge Broderick held alternatively that Pan Am was not obligated to disclose the existence of the negotiations in question and also that the failure to disclose was not knowingly misleading.

## BACKGROUND

Pan Am had been interested in acquiring National since May, 1977. By January, 1978, it had secured a $50,000,000 loan commitment from Citibank, N.A. and Pan Am's Chairman, William T. Seawell, and Executive Vice President for Finance and Development, James H. Maloon, had met with National's Chairman, L.B. Maytag. However, Maytag advised Seawell that National was not interested and Pan Am allowed the Citibank loan commitment to expire. Throughout these negotiations confidentiality was preserved.

During the next few months, Seawell and Maloon made other fruitless overtures to National. Meanwhile, Texas International Airlines, Inc. began purchasing National stock and petitioned the Civil Aeronautics Board for permission to acquire control. In response, Pan Am began purchasing National shares on its own, acquiring .4% of National's stock by August 15.

On August 8, 1978, Pan Am's investment banker, Lehman Brothers Kuhn Loeb Inc., submitted a report to Pan Am recommending a call of debentures prior to September, 1978. One objective of the proposed call was to induce holders to convert debentures into capital stock, since at that time the stock was trading in excess of the so-called "effective conversion price"—that stock price equal to the amount due debentureholders upon redemption. Other objectives of the call included savings on interest payments, tax savings due to loss-taking, simplification of the company's capital structure, and a strengthening of its equity base.

On August 15, 1978, Pan Am's Executive Committee adopted two resolutions. The first authorized acquisition of up to 10% of National's stock and further negotiations for the acquisition of National. The second authorized the call of $25,000,000 of 10½% convertible debentures for redemption on September 29, 1978, at 110% of face value plus accrued interest from August 14 to September 29. The particular debentures called were to be determined randomly and were redeemable either in cash or through conversion to capital stock. On August 15, a press release announced the redemption but did not mention Pan Am's intentions toward National. On the same day, Pan

Am secured a second loan commitment from Citibank. Between August 15 and August 23, Pan Am negotiated with National, while increasing its share of stock holdings in National to 4.8%. No public announcement of the negotiations was made.

On August 23, both National and Pan Am issued press releases reporting that a firm merger offer was under consideration. Subsequent press releases on the merger negotiations were also issued and, on September 7, the merger was announced at $41.00/share.

On August 29, Pan Am announced that it was expanding the call to all debentures. At all relevant times, Pan Am common shares were traded at prices exceeding the conversion price of the debentures. However, the price of Pan Am stock rose even higher after the August 23 announcements.

Plaintiff Reiss and the other members of the class sold their debentures between August 15 and August 22. They claim that Pan Am's failure to disclose the merger negotiations with National between those dates amounted to an intentional withholding of material information in violation of section 10(b) and Rule 10b–5 of the Act.

We affirm Judge Broderick's decision.

## DISCUSSION

Reiss argues that Pan Am's August 15 decision to renew negotiations with National, its second loan commitment from Citibank, and the status of these negotiations between August 15 and 23 were material facts which were not timely disclosed to the debentureholders. His claim is based on the following facts: (1) the August 23 announcement affected the value of the debentures by causing Pan Am's stock to rise in price; (2) Pan Am's Form 8–k for August, 1978, reported the relevant events; and (3) the circumstances on August 15 did not differ significantly from the circumstances on August 23, when the first press release disclosing the merger negotiations was issued. Essentially he argues that since the merger information affected the value of the debentures when announced, it

should have been disclosed at the earlier rather than later date. Finally, he contends that *scienter* is present because Pan Am's decisions as to the timing of the various announcements was conscious.

We consider first Pan Am's obligation to disclose various events. Assuming that the partial call of the debentures constituted a "purchase or sale" for purposes of section 10(b) and Rule 10b–5, Pan Am's August 15 announcement of the partial call of debentures was not misleading. Liability thus must rest on a showing that additional information should have been released so as to avoid "assertions . . . so incomplete as to mislead" the debentureholders. *Securities and Exchange Commission v. Texas Gulf Sulphur, Co.,* 401 F.2d 833, 862 (2d Cir.1968) (en banc), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). Since such a claim must be viewed "in the light of the facts existing at the time of the release, . . ." *id.* at 863, hindsight is of limited value and the fact that ultimate disclosure of the negotiations affected stock price is not compelling. This is particularly so since that price was at all times greater than the effective conversion price.

The Form 8–k is entirely irrelevant since the events it in fact describes occurred after August 23. Thus, even if the contents of an 8–k constitute an admission of Rule 10b–5 materiality, a conclusion which is anything but self-evident, this 8–k was no such admission.

■ Reiss attempts to supply the missing link by asserting that the facts on August 15 differed in no relevant respect from the facts on August 23, when Pan Am announced its merger offer. Arguing that the fact of an offer on August 23 is no more or less relevant than a loan commitment on August 15 or than Pan Am's overtures to National between August 15 and 23, Reiss argues that since the status of the negotiations on August 23 was disclosed, the earlier events of supposed equal stature should also have been given to the investing public.

Even assuming these various events were of comparable relevance, however, the prof-

fered conclusion confuses materiality under section 10(b) with consistency in corporate public relations decisions. Disclosure is a matter of corporate discretion where legally material facts are not involved, and, absent a finding of materiality, disclosure at one time does not imply a legal obligation to disclose at a different time. It does not serve the underlying purposes of the securities acts to compel disclosure of merger negotiations in the not unusual circumstances before us. *See Staffin v. Greenberg,* 672 F.2d 1196, 1206 (3d Cir.1982). *See also Missouri Portland Cement Co. v. H.K. Porter Co.,* 535 F.2d 388, 398 (8th Cir.1976); *Susquehanna Corp. v. Pan American Sulphur Co.,* 423 F.2d 1075, 1085–86 (5th Cir. 1970); *Bucher v. Shumway,* [1979–80 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,142, at 96,302 (S.D.N.Y.1979), aff'd, 622 F.2d 572 (2d Cir.1980), *cert. denied,* 449 U.S. 841, 101 S.Ct. 120, 66 L.Ed.2d 48 (1980). Such negotiations are inherently fluid and the eventual outcome is shrouded in uncertainty. Disclosure may in fact be more misleading than secrecy so far as investment decisions are concerned. We are not confronted here with a failure to disclose hard facts which definitely affect a company's financial prospects. Rather, we deal with complex bargaining between two (and often more) parties which may fail as well as succeed, or may succeed on terms which vary greatly from those under consideration at the suggested time of disclosure. We have no doubt that had Pan Am disclosed the existence of negotiations on August 15 and had those negotiations failed, we would have been asked to decide a section 10b–5 action challenging that disclosure.

 The district court also held that Pan Am lacked *scienter,* an independently dispositive grounds for summary judgment. *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). To prove *scienter,* more than a conscious failure to disclose must be shown. Rather, there must be proof that the non-disclosure was intended to mislead. Reiss's argument itself rebuts any inference to that effect. His contention is that Pan Am called the debentures in order to encourage deben-

tureholders to convert to common stock. He also argues, however, that he and the class he represents sold rather than convert as a result of the nondisclosure. Since conversion would improve Pan Am's debt structure even more than redemption by retaining investment capital while at the same time securing the interest and tax savings from the call, Pan Am had every reason to disclose information which would have increased the trading price of its common stock, for the higher the stock price, the greater the incentive for debentureholders to convert. The non-disclosure was thus counterproductive so far as the underlying purpose of the partial call was concerned and can hardly be labeled knowingly misleading.

Plaintiffs will at best be able to prove that Pan Am failed to disclose the negotiations with National because it feared that disclosure would be misleading under the circumstances or would adversely affect the negotiations themselves. In neither case are investors well served by a rule compelling disclosure. *See Staffin, supra.*

Affirmed.