**Karl ZUCKERMAN, Plaintiff,**

v.

**HARNISCHFEGER CORPORATION, Henry Harnischfeger, James A. Mezera, Robert D. Teece, John P. Gallagher, Herbert V. Kohler, Jr., Ralph J. Kraut, Edward P. Lebens, and Donald Taylor, Defendants.**

**No. 81 Civ. 2000–CSH.**

United States District Court, S.D. New York.

April 26, 1984.

Rabin & Silverman, New York City, for plaintiff; I. Stephen Rabin, New York City, of counsel.

Cleary, Gottlieb, Steen & Hamilton, New York City, for defendants Harnischfeger Corp., Henry Harnischfeger, James A. Mezera, and Robert D. Teece; Kirkland & Ellis, Chicago, Ill., of counsel.

Kimmelman, Sexter & Sobel, New York City, for defendants John P. Gallagher, Herbert V. Kohler, Jr., Ralph J. Kraut, Edward P. Lebens, and Donald Taylor; Coffield, Ungaretti, Harris & Slavin, Chicago, Ill., of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Plaintiff Karl Zuckerman brings this action on behalf of himself and other similarly situated purchasers of the common stock of defendant Harnischfeger Corporation ("the Company") to redress alleged violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b–5 promulgated thereunder, 17 C.F.R. 240.10b–5. The plaintiff class contemplated is comprised of those persons who purchased Harnischfeger stock during the period January 14, 1981 through March 31, 1981. Also named as defendants are the individual directors and officers of the Company during the period of the violations alleged. The case is presently before the Court on defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b). For the reasons stated, defendants' motion is granted.

## I.

*Factual Background*

Harnischfeger Corporation is a publicly owned Delaware corporation engaged in the design, manufacture, and sale of heavy industrial machinery, including electric and hydraulic mining shovels, lifting and digging equipment, overhead traveling cranes, and automated material handling systems. Its principal place of business is Milwaukee, Wisconsin. During the period at issue in this litigation, trading activity in the Company's stock increased significantly on two occasions. On January 14, 1981, the closing price of Harnischfeger stock rose to 15¾ from the previous day's close at 13⅞. The number of shares traded increased from 251,000 on January 13 to 1,178,000 shares on January 14, 1981. On the afternoon of January 14, a Harnischfeger spokesman stated publicly that the Company knew of no corporate developments that would account for the surge in trading.[1] The high volume of trading continued for another day and thereafter declined sharply. From January 28, 1981 through March 24, 1981, the closing price for the Company's stock fluctuated from a low of 14 up to a high of 17⅞. (Def.Ex. A).

The second surge in trading at issue here occurred on March 25, 1981, when 3,487,000 shares of Harnischfeger were traded, a significant increase from the previous day's total of 273,000 shares. The closing price went from 17⅞ on March 24 to 21⅛ on March 25, 1981. Again, in response to the surge in trading, a spokesman for the Company stated that it was unable to attribute the increase in volume and price to any corporate developments.[2] Trading re-

---

1. Defendants speculate that the January 14 trading surge might have been the result of takeover rumors, a hypothesis based on the fact that Harnischfeger has been the subject of two unsuccessful takeover bids in the past. On each of those occasions, the price of Harnischfeger stock fluctuated substantially. (Def.Br. at 5–6).

2. Defendants now attribute the March 25 trading surge to a rumor of an impending takeover attempt by Fluor Corporation. On March 31, 1981, Fluor announced a bid for another company, thereby scotching these rumors. Defendants hypothesize that the decline in price of Harnischfeger stock beginning March 30 is at-

mained heavy for several days, with the closing price peaking at 22 on March 27 and thereafter declining to 18¾ on March 31, 1981. (Def.Ex. A).

On April 1, 1981, the Company announced that it had reached an agreement in principle with Kobe Steel, Ltd. of Japan ("Kobe"), whereby Harnischfeger would sell to Kobe certain of its Japanese patents and certain know-how relating to construction equipment and Kobe would purchase one million shares of Harnischfeger common stock. This tentative agreement was subject to the approval of the companies' respective boards of directors. At the time of the announcement, trading in the Company's stock was temporarily suspended. The closing price that day, according to the complaint, was 16¼. (Comp. ¶ 15).

With these facts in mind, I turn to defendants' motion to dismiss.

## II.

*Motion to Dismiss*

Defendants move to dismiss the complaint on various asserted grounds, including failure to plead fraud with particularity as required by Fed.R.Civ.P. 9(b) and failure to allege the various elements requisite to a § 10(b) cause of action. Section 10(b) of the Securities and Exchange Act of 1934 forbids manipulative or deceptive conduct "in connection with the purchase or sale of any security...." Rule 10b–5, promulgated thereunder, makes it unlawful for any person, directly or indirectly,

> "(a) To employ any device, scheme, or artifice to defraud,
>
> "(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> "(c) To engage in any act, practice, or course of business which operates or would operate was a fraud or deceit upon

tributable to speculators unloading their Harnischfeger shares in response to a change in

any person, in connection with the purchase or sale of any security."

Plaintiff alleges in the complaint that the Company's public statements on January 14, 1981, and March 25, 1981, disavowing any corporate developments that could account for the surge in trading on those dates, were "false and misleading announcements" which "caused the price of the Company's stock to rise to or remain at higher levels than if the true facts had been stated...." (Comp. ¶ 16). The misstatements alleged, which plaintiff now characterizes as "mixed misrepresentations and non-disclosures" (Pl.Br. at 15), involve defendants' failure to divulge publicly that the Company "was engaged or had determined to engage in negotiations with Kobe Steel ... to sell 1,000,000 shares of its stock to that company." (Comp. ¶ 14). Plaintiff concludes therefrom that purchasers of Harnischfeger stock during the period January 14, 1981 through March 31, 1981 have been damaged in that they "paid inflated prices for the stock." (Comp. ¶ 16).

Certain of the allegations set forth in plaintiff's complaint do not, in my view, satisfy Rule 9(b)'s specificity requirement, while the complaint as a whole is more fundamentally defective in that it fails to assert the elements necessary to an actionable claim under the securities laws. Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." This refinement of the Federal Rules' otherwise simplified pleading approach is intended to protect defendants from the substantial harm that could result from vaguely pleaded or speculatively based claims of serious wrongdoing. It further ensures that a defendant accused of fraudulent conduct will be fully apprised of the grounds upon which that claim rests. *Ross v. A.H. Robins Co., Inc.,* 607 F.2d 545, 557 (2d Cir.1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980),

marketplace information. (Def.Br. at 7, n. *).

*rehearing denied*, 448 U.S. 911, 100 S.Ct. 3057, 65 L.Ed.2d 1140 (1980); *Denny v. Barber*, 576 F.2d 465, 469 (2d Cir.1978); *Segal v. Gordon*, 467 F.2d 602, 607 (2d Cir.1972). As stated by the Second Circuit: "[T]o pass muster in this Circuit a complaint 'must allege with some specificity the acts constituting the fraud' [citation omitted]; conclusory allegations that defendant's conduct was fraudulent or deceptive are not enough." *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 114 (2d Cir. 1982). In the context of § 10(b) litigation, "plaintiff must allege acts indicating an intent to deceive, manipulate or defraud ..., and Rule 9(b) requires that the circumstances constituting such fraud be stated with particularity." *Id.* at 115. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 103 S.Ct. 683, 692, 74 L.Ed.2d 548 (1983) ("[A] Section 10(b) plaintiff carries a heavier burden than a Section 11 plaintiff. Most significantly, he must prove that the defendant acted with scienter, *i.e.*, with intent to deceive, manipulate, or defraud.").

Plaintiff's only allegation of the requisite "scienter" or "intent to deceive" is as follows:

"17. All of the defendants herein knew or were reckless in not knowing, or were negligent in knowing, that the statements complained of were false and misleading, and in authorizing, permitting or failing to take action to correct said statements." (Comp. ¶ 17).

■ Defendants correctly argue that negligence alone is insufficient to ground a § 10(b) claim, *Chemical Bank v. Arthur Andersen & Co.*, 552 F.Supp. 439, 455 (S.D. N.Y.1982); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976), but incorrectly contend that, absent some fiduciary relationship, liability under § 10(b) cannot be premised on recklessness, regardless of whether the defendant is an "aider and abetter" or "primary wrongdoer." (Def. Reply Br. at 17). As stated by the Court of Appeals for this Circuit:

"This court has held that proof of reckless conduct meets the requirement of

scienter in a section 10(b) claim, *IIT v. Cornfeld*, 619 F.2d [909] at 923. For the imposition of aider and abettor liability under section 10(b), however, we have held that recklessness satisfies the scienter requirement where 'the alleged aider and abettor owes a fiduciary duty to the defrauded party,' *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d [38] at 44." *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 575 (2d Cir.), *cert. denied* [459 U.S. 908] 103 S.Ct. 213 [74 L.Ed.2d 170] (1982). *See also Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir.1983).

In *ITT v. Cornfeld*, 619 F.2d 909 (2d Cir. 1980), the case to which *Sirota* cites, the Second Circuit observed:

"*Scienter.* Recognizing that there can be no certainty on the subject until the Supreme Court fleshes out footnote 12 of *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 [96 S.Ct. 1375, 47 L.Ed.2d 668] (1976), we shall continue to follow our own decisions, see, e.g., *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1300–02 (1973) (en banc), as well as those of other courts of appeals with which we agree, that reckless conduct will generally satisfy the *scienter* requirement. However, there are special considerations in applying this general principle to aiders and abettors." *Cornfeld, supra*, 619 F.2d at 923.

■ In short, contrary to defendants' assertion, liability for recklessness under § 10(b) requires a fiduciary relationship only in the aiding and abetting context, where the defendant's participation is arguably more attenuated. This distinction is reiterated in *Edwards & Hanly v. Wells Fargo Securities Corp.*, 602 F.2d 478 (2d Cir.1979), *cert. denied*, 444 U.S. 1045, 100 S.Ct. 734, 62 L.Ed.2d 731 (1980):

"Finding a person liable for aiding and abetting a violation of 10b–5, *as distinct from committing the violation as a principal*, requires something closer to an actual intent to aid in a fraud, at least in the absence of some special relationship with the plaintiff that is fiduciary in nature."

*Id.* at 485 (emphasis added).

Where, as here, plaintiff contends that "Harnischfeger and its directors were primary wrongdoers" (Pl.Br. at 21), recklessness may constitute sufficient scienter to sustain a § 10(b) violation. *See Chemical Bank, supra,* 552 F.Supp. at 457.

■ The theoretical availability of a § 10(b) cause of action predicated on reckless conduct does not, however, cure the serious deficiencies in ¶ 17 of the complaint. Certainly this species of grab-bag pleading cannot apprise the individual defendants of the fraud alleged against them. "Failing to take action" is significantly different from "authorizing" fraud, as is "knowledge" from "recklessness" or "negligence." As stated by one court: "At the very least, [Rule 9(b)] requires plaintiff to allege: (1) the nature of each individual defendant's participation in the fraud, including the facts constituting scienter...." *Natowitz v. Mehlman,* 542 F.Supp. 674, 676 (S.D.N.Y.1981). *See also Goldberg v. Meridor,* 81 F.R.D. 105, 111 (S.D.N.Y. 1979). A party charged with fraudulent conduct "is entitled to notice of the particular allegations on which the claim is based and is entitled to notice of the particular wrongs which he or she as an individual, as opposed to a member of a broad group ... is charged." *O'Connor & Associates v. Dean Witter Reynolds, Inc.,* 529 F.Supp. 1179, 1197 (S.D.N.Y.1981). The "mere assertion that wrongful statements were made, without more, is wholly insufficient to support a claim of fraud." *Juster v. Rothschild, Unterberg, Towbin,* 554 F.Supp. 331, 334 (S.D.N.Y.1983).

■ A generous reading of the complaint suggests, at best, that defendants knew about the Kobe negotiations. However, given that the statements of January 14 and March 25 were not, contrary to plaintiff's characterization, "denials" of those negotiations, defendants' knowledge cannot be transmuted into an intentional effort to defraud investors for § 10(b) purposes. "To prove *scienter,* more than a conscious failure to disclose must be shown. Rather, there must be proof that the non-disclosure was intended to mis-

lead." *Reiss v. Pan American Airways,* 711 F.2d 11, 14 (2d Cir.1983). *See also State Teachers Retirement Board v. Fluor Corporation,* 654 F.2d 843, 851 (2d Cir.1981).

■ Finally, plaintiff's statement that he believes the eight individual defendants "knew of the negotiations and adopted a policy of denial" but that "it is simply impossible for the plaintiff to *know* at this time whether he is correct" (Pl.Br. at 22) underscores the inadequacy of his pleading and the futility of granting leave to replead. Simply put, a plaintiff "must know what his claim is when he files it"; he "cannot rely on later discovery to rectify this defect...." *Natowitz, supra,* 542 F.Supp. at 676. Indeed, in the context of securities litigation, Rule 9(b) operates to diminish the possibility that a plaintiff with a largely groundless claim will be permitted to conduct extensive, costly, and time-consuming discovery, "with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the process will reveal relevant evidence...." *Denny, supra,* 576 F.2d at 470. *See Decker v. Massey-Ferguson, Ltd.,* 681 F.2d 111, 115 (2d Cir.1982) ("Because the 'in terrorem' effect of such unfettered discovery would, to say the least, be substantial, it is important that the wheat in plaintiff's pleading be separated from the chaff."). I conclude that the complaint fails to meet Rule 9(b)'s specificity requirement, an infirmity attributable more to the speculative nature of plaintiff's claim than to inartful pleading. Because I perceive additional deficiencies in the complaint sufficient to mandate dismissal, I need not address the question of whether leave to replead should be granted in this instance.

### III.

Obviously central to the validity of a claim under Rule 10b–5(b) is an "untrue" or "misleading" statement. Defendants vigorously dispute the contention that the Company's January 14 and March 25, 1981 statements can fairly be characterized as

such. Noting that the first public announcement regarding the Kobe deal was not made until April 1, 1981, defendants argue that the two surges in trading which prompted their January and March statements cannot plausibly be regarded as a result of those as yet undisclosed discussions. In short, plaintiff cannot argue that "an undisclosed event affected stock market activity." (Def.Br. at 8). Thus, statements to the effect that the Company knew of no corporate developments "to account for" the increase in trading volume are, according to defendants, patently true. By the same token, since non-public negotiations could not account for the increase in trading, non-disclosure of those negotiations "could not constitute an omission to state a fact necessary to make statements actually made not misleading." (Def.Br. at 8–9).[3]

Apparently recognizing the surface appeal of defendants' argument, plaintiff now attempts to recharacterize the nature of the allegations made in the complaint by asserting, for the first time and in conclusory fashion, that the Kobe negotiations "triggered rumors of an impending corporate deal" (Pl.Br. at 2) which increased activity in the Company's stock. Once secrecy was breached, plaintiff argues, "even if those rumors were erroneous with respect to the specifics of the deal ... Harnischfeger's denial of any deal at all was false and misleading...." (Pl.Br. at 8–9).

First, I find rather perplexing plaintiff's contention that defendants denied the existence "of any deal at all." Certainly such an affirmative representation cannot be gleaned from the Company's circumscribed remarks. Further, plaintiff's shift in theory generates, in my view, certain inescapable inconsistencies. On the one hand, plaintiff alleges in the complaint that defendants' "false and misleading announcements caused the price of the Company's stock to rise or to remain at higher lev-

els...." (Comp. ¶ 16). As already noted, however, the January 14 statement was proffered in response to the increased trading activity in Harnischfeger stock and the concomitant rise in price. In substance, the Company represented that it could not specifically account for the surge in volume. Such an after-the-fact statement elicited to explain a market phenomenon cannot logically be said to account for that phenomenon. Nor did the price of Harnischfeger common stock remain at a high level following the announcement; it began to decline within a day or two thereafter. (*See* Def.Ex. A).

Plaintiff's revised theory suggests that rumors of an impending deal with Kobe prompted the surge of trading and drove up the price of Harnischfeger stock. Yet the actual announcement of the Kobe deal, according to plaintiff, drove the price down. (Comp. ¶ 15). Aside from plaintiff's contradictory views on the market impact of the Kobe negotiations, which arguably make sense if the rumors were imprecise as to the actual nature of the deal contemplated, the belated intimation of marketplace rumors as the source of increased trading again belies the notion that defendants' statements caused the stock to reach "inflated" prices. In a supplementary letter to the Court, plaintiff's counsel states that, in response to these alleged rumors:

> "Harnischfeger could have remained silent, or it could have explained the nature of the negotiations with Kobe, thereby preventing the rise and subsequent decline of the stock."

Plaintiff's position is again baffling. While acknowledging that the Company could permissibly remain silent in the face of rising prices, plaintiff goes on to argue that, once a statement was issued, defendants were obligated to disclose the negotiations to "prevent" the rise in price. Yet the Company did, in effect, remain silent

---

3. Notably, this is not a "disclose-or-abstain" case under Rule 10b–5. *See Chiarella v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1979); *United States v. Newman,* 664 F.2d 12 (2d Cir.1981), *cert. denied,* — U.S. —, 104

S.Ct. 193, 78 L.Ed.2d 170 (1983). Plaintiff does not allege that defendants improperly traded on inside information which, by virtue of a fiduciary relationship, they had an obligation to disclose.

while the price of its stock increased, and the announcement offered in response to this price rise could not logically prevent it.

In rejecting the argument that a company was obligated to disclose the signing of a significant contract when "rumors became rampant and the price and volume of its stock shot upward," *State Teachers Retirement Board v. Fluor Corp.*, 654 F.2d 843, 850 (2d Cir.1981), the Second Circuit stated that "[a] company has no duty to correct or verify rumors in the marketplace unless those rumors can be attributed to the company." *Id. See also Weintraub v. Texasgulf Inc.*, 564 F.Supp. 1466, 1470 (S.D.N.Y.1983) (corporation has no duty to investigate the reasons for unusually heavy trading in its stock). Certainly no such attribution has been alleged here. Nor can it be said, as plaintiff now appears to suggest, that defendants' statements were intended to be comments on a specific rumor—indeed, the complaint is devoid of any mention of rumors or defendants' knowledge of them—much less a "denial that any negotiations were taking place...." (Pl. letter). *Compare Schlanger v. Four-Phase Systems, Inc.*, 555 F.Supp. 535, 537 (S.D.N.Y.1977) (false and misleading statement sufficiently alleged where complaint asserted that rise in market price was the result of "a leakage into the marketplace of information relating to merger negotiations," that defendant knew the leak had in fact affected market price, and yet defendant stated that it was "not aware of any corporate developments which would affect the market for its stock."). Quoting the lower court's opinion in *Fluor*, 500 F.Supp. 278 (S.D.N.Y.1980), the Court of Appeals observed in its affirmance that "it is simply not realistic to say that a corporation may determine when it will release information and then hold it liable when its representatives make comments—as they inevitably will in the normal course of business—that do not mention this information." *Id.* at 299.

The Second Circuit's recent decision in *Reiss v. Pan American World Airways*, 711 F.2d 11 (2d Cir.1983), is instructive in this regard. Plaintiffs in *Reiss*, holders of Pan Am convertible debentures that had been called, alleged violations of § 10(b) and Rule 10b–5 based on defendant's failure to disclose the existence of ongoing merger negotiations at the time of the call. They contended that if they had known of these negotiations, they would have converted their debentures into stock rather than selling them. The Court first noted that liability for non-disclosure "must rest on a showing that additional information should have been released so as to avoid 'assertions ... so incomplete as to mislead' the debentureholders. *Securities and Exchange Commission v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 862 (2d Cir.1968) (en banc), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969)." *Reiss, supra*, 711 F.2d at 13. The statements made must be viewed in light of the facts known to defendants at the time, and, significantly, "the fact that ultimate disclosure of the negotiations affected stock price is not compelling." *Id.* The Court went on to observe as follows:

> "It does not serve the underlying purposes of the securities acts to compel disclosure of merger negotiations in the not unusual circumstances before us.... Such negotiations are inherently fluid and the eventual outcome is shrouded in uncertainty. Disclosure may in fact be more misleading than secrecy so far as investment decisions are concerned. We are not confronted here with a failure to disclose hard facts which definitely affect a company's financial prospects. Rather, we deal with complex bargaining between two (and often more) parties which may fail as well as succeed, or may succeed on terms which vary greatly from those under consideration at the suggested time of disclosure." *Id.* at 14 (citations omitted).

■ Here, the complaint alleges only that defendants were asked to comment on increased trading in the Company's stock. It does not suggest that they knew of rumors regarding a deal with Kobe, or that they were asked to confirm or deny such rumors. Given that disclosure of inchoate

corporate dealings is normally a matter of corporate discretion, defendants were not, under these circumstances, obligated to volunteer information about negotiations which they presumed to be non-public.

▇ It is also difficult to ascertain from the complaint the requisite causal nexus between the Company's statements and plaintiff's purported injury. As the Supreme Court has made clear, § 10(b) and Rule 10b–5 are intended to afford redress only for injuries suffered as a result of deceptive practices "touching" or "in connection with" the purchase or sale of securities. *Superintendent of Insurance of New York v. Bankers Life & Casualty Co.*, 404 U.S. 6, 12–13, 92 S.Ct. 165, 168–169, 30 L.Ed.2d 128 (1971). In order to "restrict the potentially limitless thrust of Rule 10b–5 to those situations in which there exists causation in fact between the defendant's act and the plaintiff's injury," *Wilson v. Comtech Telecommunications Corp.*, 648 F.2d 88, 92 (2d Cir.1981); *see Titan Group, Inc. v. Faggen*, 513 F.2d 234, 238–39 (2d Cir.1975), courts have generally looked to plaintiff's reliance on the alleged misrepresentations as a prerequisite to recovery. *See Wilson, supra; Madison Consultants v. Federal Deposit Insurance Corp.*, 710 F.2d 57, 62 (2d Cir.1983); *List v. Fashion Park, Inc.*, 340 F.2d 457, 462–63 (2d Cir.), *cert. denied sub nom. List v. Lerner*, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965). In the case of an affirmative misrepresentation, the inquiry is a bifurcated one: (1) Did plaintiff believe what defendant said?; and (2) Did that belief cause plaintiff to act? Simply stated, whatever semantic distinctions one might draw between the concepts of reliance and causation, a plaintiff must ultimately demonstrate that he purchased or sold stock *because* he was misinformed or uninformed, and that, properly informed, "he would have succeeded in preventing the loss he in fact suffered." *Madison Consultants, supra*, 710 F.2d at 65.

From the sparse allegations of the complaint, it is difficult to derive either of these essential elements. First, as defendants properly observe, the complaint does not indicate when plaintiff purchased stock in Harnischfeger, other than to state that his purchase took place sometime during the period January 14, 1981 to March 31, 1981. In his opposition brief, plaintiff states that he purchased shares on five separate occasions commencing on January 14, 1981 and concluding on March 25, 1981, and still retains these securities.[4] Yet given the critical importance of establishing that defendants' alleged misrepresentations were the cause of his loss, *Madison Consultants, supra*, 710 F.2d at 64, I find it troubling that plaintiff is so imprecise as to the timing of his purchases. Notably, both the January 14 and the March 25 Harnischfeger statements were issued *in response to* a period of intensified trading in the Company's stock. It is at least possible, even probable, that plaintiff participated in this trading surge and therefore cannot argue that statements issued late on those days caused his loss, or that he relied thereon. See *Issen v. GSC Enterprises*, 508 F.Supp. 1278, 1286 (N.D.Ill. 1981) (satisfaction of the "in connection with" requirement depends upon whether an investment decision remains to be made by the party from whom disclosure is withheld). Further, in my view, plaintiff has compounded rather than cured the deficiency in his pleadings by stating that he "at least arguably" purchased Harnischfeger shares after the March 25 announcement. (Pl.Br. at 14). The only inference I can reasonably draw from this vague assertion is that plaintiff is unsure of the timing of his purchase with respect to the alleged misstatement, a finding that inexorably leads me to conclude that his purchase of Harnischfeger stock on March 25 was in no

---

**4.** The purchases alleged are as follows:

| Date | Amount | Price |
| --- | --- | --- |
| 1/14 | 500 | 16⅜ |
| 1/14 | 500 | 16½ |
| 2/6 | 500 | 16 |
| 2/9 | 1,000 | 16¾ |
| 3/10 | 1,000 | 16⅛ |
| 3/25 | 1,000 | 18½ |

way prompted by the Company's announcement that day.

While plaintiff's purchases on February 6 and 9, and on March 10, unquestionably took place after the January 14 statement, the lapse of time between the statement and the purchases was considerable. As reflected in the trading records, the flurry of activity in Harnischfeger trading fell off precipitately after January 15 and returned to rather unremarkable levels. While the "in connection with" requirement of section 10(b) is to be construed flexibly rather than technically or restrictively, *Superintendent of Insurance, supra,* 404 U.S. at 12, 92 S.Ct. at 169, *United States v. Newman,* 664 F.2d 12, 18 (2d Cir.1981), some discernible nexus between the allegedly fraudulent conduct and the purchase of securities is required. Plaintiff here seeks to impose liability on defendant for an alleged misrepresentation made many weeks prior to his purchase of Harnischfeger stock and long after the surge in trading roughly contemporaneous with that statement had abated, without alleging his reliance on that statement.

Plaintiff seeks to skirt the necessity of demonstrating reliance by arguing that, in the instance of a non-disclosure versus an affirmative misrepresentation, it is not necessary to plead or prove reliance. While it is true that causation in fact may be established in instances of nondisclosure if "the facts withheld [are] material....," *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1971), the Supreme Court's reason for so holding is essential to an understanding of § 10(b) pleading requirements. As the Second Circuit has explained:

"[T]he Court [in *Affiliated Ute*] rather than abolishing reliance as a prerequisite to recovery, was recognizing the frequent difficulty in *proving,* as a practical matter, that the alleged misrepresentation, allegedly relied upon, caused the injury.... Unlike instances of affirmative misrepresentation where it can be demonstrated that the injured party relied upon affirmative statements, in instances of total non-disclosure, as in *Affiliated Ute,* it is of course impossible to demonstrate reliance...." *Titan Group, Inc. v. Faggen,* 513 F.2d 234, 238–39 (2d Cir.1975).

In *Wilson v. Comtech, supra,* the Court of Appeals dismissed the "omission" versus "misrepresentation" debate as question begging for purposes of establishing reliance: "The labels by themselves are of little help. What is important is to understand the rationale for a presumption of causation in fact in cases like *Affiliated Ute,* in which no positive statements exist: reliance as a practical matter is impossible to prove." *Wilson v. Comtech, supra,* 648 F.2d at 93. No such impossibility exists here. Positive statements do exist and plaintiff cannot escape the obligation of pleading reliance on those assertions he alleges were fraudulent. The complaint is completely deficient in this regard.

Nor am I persuaded by plaintiff's suggestion that the complaint adequately sets forth a "fraud on the market" or "market impact" theory, thereby obviating the need to plead reliance. While, as noted above, reliance has traditionally provided the causal nexus between the fraud alleged and the plaintiff's injury, certain recent cases have reformulated the reliance element to permit a plaintiff to rely on the integrity of the market rather than on a particular misrepresentation or omission. As stated by the Court of Appeals for the Tenth Circuit:

"The theory is grounded on the assumption that the market price reflects all known material information. Material misinformation will theoretically cause the artificial inflation or deflation of the stock price. At its simplest the theory requires only that a plaintiff prove purchase of a security and that a material misrepresentation was made concerning the security by the defendant which resulted in an artificial change in price." *T.J. Raney & Sons v. Fort Cobb, Oklahoma Irrigation Fuel Authority,* 717 F.2d 1330, 1332 (10th Cir.1983).

The Second Circuit's decision in *Panzirer v. Wolf,* 663 F.2d 365 (2d Cir.1981), *vacated*

on suggestion of mootness sub nom. *Price Waterhouse v. Panzirer*, 459 U.S. 1027, 103 S.Ct. 434, 74 L.Ed.2d 594 (1982), delineates the parameters of the theory in this Circuit. The alleged fraud in *Panzirer* involved a false annual report which plaintiff concededly never read before purchasing stock in defendants' company. Plaintiff did, however, read and rely on an article in *The Wall Street Journal* which she claimed "would have presented the company in a less favorable light had the annual report been accurate." *Id.* at 366. The Second Circuit, rejecting the district court's distinction between "primary and secondary reliance" in a 10b–5 action, observed as follows:

"The function of requiring the plaintiff to show reliance in a 10b–5 action is to permit only those injured by fraud to sue. If plaintiff can link her injury to defendant's fraud by showing the fraud was a 'substantial' or 'significant contributing cause,' plaintiff has shown sufficient reliance to support her 10b–5 claim. *Wilson v. Comtech Telecommunications Corp.*, 648 F.2d 88, 92 (2d Cir. 1981). Plaintiff has on this record stated a sufficient connection between her loss and the allegedly fraudulent annual report to withstand a motion for summary judgment." *Id.* at 367.

The Court went on to note that plaintiff had alleged a "chain of causation" sufficient to state a "claim of reliance on the misrepresentation or omission." *Id.* at 368. The fact that plaintiff "must trace her reliance on defendant's alleged fraud through the reactions of third parties does not vitiate her claim under 10b–5." *Id.*

▆ Simply put, the market impact theory relied on by plaintiff does not eliminate the element of reliance but rather permits a more flexible construction of it. The notion is one of derivative reliance, which at a minimum requires that plaintiff allege that some market traders relied on the material deception asserted, thereby effecting a change in price, and that plaintiff justifiably relied on the integrity of the market in making his purchase decision. Pivotal to the fraud on the market theory is the assumption that market prices respond to disseminated information concerning the companies whose securities are being traded. As stated by one court:

"[E]conomists have now amassed sufficient empirical data to justify a present belief that widely-followed securities of larger corporations are 'efficiently' priced: the market price of stocks reflects all available public information and hence necessarily, any material misrepresentations as well."

*In re LTV Securities Litigation*, 88 F.R.D. 134, 144 (N.D.Tex.1980).

▆ The obvious difficulty with plaintiff's efforts to invoke the fraud-on-the-market theory is, again, that defendants' alleged misstatement was issued after the price rise in Harnischfeger had occurred, an increase that plaintiff himself now attributes to rumors in the marketplace which prompted speculative trading. Where the purportedly fraudulent representations concerning a company are not made prior to the market impact alleged, the fraud-on-the-market theory is not a viable one. In short, this is not an instance where "a material misrepresentation ... was made ... by the defendant which resulted in an artificial change in price." *T.J. Raney, supra*, 717 F.2d at 1332. At best, plaintiff's contention is that he purchased stock at already inflated prices because defendants failed to correct or clarify a misperception as to the nature of the negotiations underway with Kobe. But, as discussed above, plaintiff has not alleged that these rumors emanated from the Company or that defendants were even aware of them. Accordingly, defendants were under no obligation to disclose their discussions with Kobe or to launch an independent investigation into the possible reasons for the exceptionally heavy trading in Harnischfeger shares. *Weintraub v. Texas-Gulf, Inc.*, 564 F.Supp. 1466, 1468 (S.D.N.Y.1983). Plaintiff's disappointment in the outcome of a speculative series of trades is not a sufficient basis for the serious securities violations alleged.

## CONCLUSION

For the reasons stated, defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6) for failure to plead fraud with particularity and for failure to state a claim upon which relief can be granted is granted.

The Clerk of the Court is directed to dismiss the complaint with prejudice and with costs.

It is SO ORDERED.