**C. G. JOHNSON, Plaintiff-Appellant,**

v.

**Herbert L. WIGGS, Defendant-Appellee.**

**No. 29924.**

United States Court of Appeals,
Fifth Circuit.

June 8, 1971.

------

George A. Crowley, Fort Worth, Tex., Scurry, Scurry, Hodges & Johnson, Richard H. Hodges, Dallas, Tex., Brown, Crowley, Simon & Peebles, Fort Worth, Tex., for plaintiff-appellant.

George C. Chapman, Thompson, Knight, Simmons & Bullion, Dallas, Tex., for defendant-appellee.

Before JONES, BELL and SIMPSON, Circuit Judges.

JONES, Circuit Judge:

The appellant, C. G. Johnson, brought an action against the appellee, Herbert L. Wiggs, under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j and Rule 10b–5 of the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5, claiming that Wiggs as an insider with information which he, Johnson, did not have, purchased securities from him at a price less than they were worth.

Johnson had retained Thomas R. Tyler, an accountant of Fort Worth, Texas, to manage his financial affairs. In 1961 Johnson acquired 59,000 shares of the stock of Western Reserve Corporation. This stock was approximately 9.-3% of the outstanding shares. Johnson was the second largest stockholder in the corporation. All mail from the company to Johnson was sent to Tyler, who advised Johnson as to any decisions which would be made regarding the stock.

Western Reserve was founded by Wiggs in 1945. He served as president until he resigned on March 9, 1968. Johnson decided the Western Reserve stock was a losing investment. For several years Tyler and Johnson attempted to sell the stock. These attempts were fruitless. In January 1968 Tyler contacted the Merrill-Lynch brokerage firm and was advised that the investment firm of Manney & Co. of Dallas was or might be making a market for the stock. Neither Tyler nor Johnson made any effort to contact Manney.

The primary asset of Western Reserve was the stock of Continental Fidelity Insurance Co. A distribution of two shares of Continental Fidelity for each five shares of Western Reserve had been authorized. It did not have enough stock of Continental Fidelity to make the distribution. Shareholders were contacted by Wiggs and were asked if they would sell their Western Reserve stock with the Continental Fidelity rights so that sufficient shares of Continental Fidelity would be available for distribution. Wiggs telephoned Tyler and asked if Johnson would sell the rights to the 20,000 shares of Continental Fidelity which he was entitled to receive in distribution. Wiggs offered to buy at the then current market price of 60-cents a share. Tyler said he would contact Johnson and would let Wiggs know if Johnson was interested. Having heard nothing from Tyler, Wiggs again called him and asked if Johnson would prefer to sell his Continental Fidelity shares and his 50,000 shares of Western Reserve. Still having no word from Tyler, Wiggs again called him and Tyler advised that he had heard nothing from Johnson. At this time, Wiggs raised his offer for the Continental Fidelity stock to 79-cents a share. During the next 46 days there was no communication between Tyler and Wiggs. On or about March 20, 1968, Johnson met Tyler and authorized him to sell to Wiggs the 50,000 shares of Western Reserve with the rights to Continental Fidelity for $17,500. On March 25, 1968 Tyler called Wiggs and advised that Johnson would take $17,500 for "the whole ball of wax," that is, the 50,000 shares of Western Reserve with the Continental Fidelity rights. This offer was later accepted by Wiggs. Tyler was instructed to send the endorsed stock certificates to the Republic National Bank of Dallas. They were received on March 27, 1968 and payment was made.

Some time prior to the offer of March 25, 1968, Wiggs answered an advertisement in the Wall Street Journal seeking acquisition of a "shell" corporation with a large number of stockholders. This led to Western Reserve's acquisition of approximately 72% of the stock of Universal Computa-Data Corporation. Its president, Kevin Halter, replaced Wiggs as president of Western Reserve. This acquisition was made public by articles in the Dallas Morning News and the Dallas Times Herald on March 14, 1968. The following day Halter appeared on a Dallas television station and discussed the acquisition. The newspaper report was ten days prior to Tyler's offer to sell to Wiggs. Halter, the new president of Western Reserve, sent a letter on March 19, 1968 to Western Reserve stockholders advising them of the acquisition and referring to the newspaper articles. In this letter, stockholders were advised that during the past three weeks the price had risen from 25-cents bid to $1.00 bid and that a number of brokers were now making a market for the stock. In the ordinary course of the mail Johnson would have received this letter before the offer was made to Wiggs.

Manney & Company had previously been making the market in Western Reserve stock. On March 11, 1968 Wiggs introduced Halter to Manney. After a conversation between Halter and Manney, outside the presence of Wiggs, Manney offered Wiggs 75-cents a share for 5,000 shares of Western Reserve, without the rights to Continental Fidelity. Wiggs, although surprised at the amount of the offer, accepted it and on March 18, 1968, Wiggs accepted another offer of Manney for 75-cents a share for 7,500 shares of Western Reserve stock.

Tyler, when he made the March 25 offer to Wiggs, made no inquiries about the prior acquisition of Universal Computa-Data, the offers of Manney, acquisitions or market price of Western Reserve stock, or anything else relating to the corporations involved.

Quotations on Western Reserve stock like other unlisted securities were in publications called the "pink sheets" or the "National Daily Quotation Sheets." These sheets include brokers dealing in the stock listed. The brokers listed are not required to purchase more than 100 shares of stock at the bid price listed. On March 25, 1968 there was not an active market for Western Reserve stock. Wiggs testified that in his opinion the brokers listed in the "pink sheets" would not have accepted Johnson's 50,000 share block at the price quoted in the "pink sheets." There was no evidence that on March 25, 1968, Johnson could have sold the 50,000 shares for any sum greater than the $17,500 received upon the acceptance of his offer to Wiggs. It was stipulated, and the district court found, that there was no misrepresentation made to Johnson by Wiggs in connection with Wiggs' purchase of Western Reserve Corporation stock. The court found that Johnson failed to establish that the block of stock had any real or market value in excess of the amount Johnson received. The court found further that the evidence failed to show that Johnson sustained any loss as a result of his sale. The court found that newspapers and television broadcasts had reported Western Reserve's acquisition of 72% of the stock of Universal Computa-Data, and the distribution of Continental stock to Western Reserve stockholders of record as of October 28, 1967. The court found that after several attempts to sell the 50,000 shares of stock the only willing buyer Johnson and Tyler could locate was defendant Wiggs. From an adverse judgment Johnson has appealed.

Section 10 of the Securities Exchange Act of 1934 reads as follows:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or any facility of any national securities exchange—

\* \* \* \* \* \*

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C.A. § 78j.

Rule 10b–5 of the Securities and Exchange Commission is as follows:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

"(a) to employ any device, scheme, or artifice to defraud,

"(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5.

The Second Circuit has made the following statement of the purposes of the statutory provision:

"By that Act Congress purposed to prevent inequitable and unfair practices and to insure fairness in securities transactions generally, whether conducted face-to-face, over the counter, or on exchanges.

\*  \*  \*  \*  \*  \*

"The essence of the Rule is that anyone who, trading for his own account in the securities of a corporation has 'access, directly or indirectly, to information intended to be available only for a corporate purpose and not for the personal benefit of anyone' may not take 'advantage of such information knowing it is unavailable to those with whom he is dealing.'" Securities and Exchange Commission v. Texas Gulf Sulphur Co., 2nd Cir. 1968, 401 F.2d 833, 2 A.L.R. Fed. 190, cert. denied 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756.

■■ Wiggs was entitled to assume that Johnson, Western Reserve's second largest shareholder, and Tyler, his financial advisor, were aware of both the acquisition of Universal Computa-Data, and the "pink sheet" quotes of the stock on March 25, 1968, when Johnson made his offer to sell. This information was in the public domain. The acquisition was previously reported both in the area newspapers, and on a local television station which gave financial news. The current quotes and listing of brokers making a market in Western Reserve were readily available to Tyler and Johnson through any brokerage house. This type of information regarding Western Reserve had previously been given Johnson by a local Merrill-Lynch office when Johnson was attempting to find a buyer for the stock. The development of a market in the stock, the "pink sheet" price and the corporate acquisition were in the public domain and were not exclusively inside information. This being so, there was no duty or obligation on the part of Wiggs to disclose. He was not required to say that which had been publicly proclaimed in several ways on several occasions. See Hafner v. Forest Laboratories, Inc., 2nd Cir. 1965, 345 F.2d 167. Previous sales of stock by Wiggs did not create an insider situation which would taint the validity of the purchase from Johnson. Inside information " \* \* \* available only for a corporate purpose \* \* \*" did not result from sales by Wiggs or the making of a market for the stock by a broker. See Texas Gulf Sulphur, supra; Speed v. Transamerica Corp., D.Del.1951, 99 F.Supp. 808.

It may be noted that the sale by Johnson to Wiggs was made, not as a result of Wiggs' efforts to purchase but by the acceptance of an offer of Johnson to sell. The last of Wiggs' efforts to buy was on February 7, 1968. Johnson's offer to

sell was on March 25, 1968. Between these dates Wiggs had seen the advertisement in the Wall Street Journal, Western Reserve had acquired the interest in Computa-Data, publicity had been given by press and television, and the market on the stock, such as it was, had been made by a broker and quotations appeared in the "pink sheets."

Since we decide that there is no liability of Wiggs to Johnson, the question of damages need not be considered.

The court's findings are sustained by the evidence and its conclusions of law are correct. The judgment of the district court is

Affirmed.