Helen Mary POWELL, et al., Plaintiffs,

v.

AMERICAN BANK & TRUST CO.; John L. Bell, Jr.; Bell Fibre Products Corp.; and Jack S. Kightlinger, Defendants.

Civ. No. F 85–411.

United States District Court,
N.D. Indiana,
Fort Wayne Division.

Aug. 13, 1986.

William C. Barnard, Sommer & Barnard, Indianapolis, Ind., George T. Dodd, Baker & Daniels & Shoaff, Fort Wayne, Ind., for plaintiffs.

Milford M. Miller, Philip L. Carson, Grant F. Shipley, Livingston, Dildine, Haynie & Yoder, Fort Wayne, Ind., for defendants American Bank and Kightlinger.

Richard D. Wagner, James G. McIntire, Mark J.R. Merkle, Krieg, DeVault, Alexander & Capehart, Indianapolis, Ind., Jack W. Lawson, Beckman, Lawson, Sandler, Snyder & Federoff, Fort Wayne, Ind., for defendants Bell and Bell Fibre.

## ORDER

WILLIAM C. LEE, District Judge.

This matter is before the court on motions to dismiss filed by all defendants. On December 3, 1985, the defendants filed their briefs in support of the motions to dismiss. The plaintiffs filed their brief in opposition on January 31, 1986. Defendants American Bank and John Kightlinger filed their reply on February 27, and defendants John Bell, Jr. and Bell Fibre replied on March 4, 1986. The plaintiffs filed a supplemental brief in opposition on March 10, 1986. The court held a hearing on the motions on May 23, 1986. On August 4, 1986, Bell and Bell Fibre filed a Supplemental Brief in support of their motion to dismiss, which prompted the plaintiffs to file a Supplemental Brief in opposition on August 11, 1986. For the following reasons, the motions to dismiss will be denied.

This cause arises out of the sale of certain stock held in trust for the benefits of the plaintiffs ("Powells"), as well as stock individually owned by some of the plaintiffs, to defendant John L. Bell, Jr. ("Bell"). The Powells claim they were defrauded by the failure of the defendants to disclose allegedly material information about the value of the stock, and that they suffered damages as a result of fraud, breaches of fiduciary duties owed them, and the operation of a racketeering enterprise. They sue under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5 of the Securities and Exchange Commission, the Indiana Securities Regulations (I.C. 23–2–1–19), common law counts of fraud and breach of fiduciary duty, and the

Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961, *et seq.* The Powells seek actual damages of $200,000 and punitive damages of two million dollars. The defendants now seek to dismiss the complaint for failure to state a claim upon which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

In deciding a motion to dismiss for failure to state a claim, this court must take the well pleaded factual allegations of plaintiff's complaint as true. *Ashbrook v. Hoffman,* 617 F.2d 474 (7th Cir.1980). A complaint should be dismissed for failure to state a claim only if it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). However, *Conley* has never been interpreted literally. *Sutliff, Inc. v. Donovan Companies,* 727 F.2d 648, 654 (7th Cir.1984). The test is whether a complaint contains either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory. *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1106 (7th Cir.1984). This court must consider the complaint in the light most favorable to the plaintiff and must resolve every reasonable doubt in favor of the claimant. *Henry C. Beck Co. v. Fort Wayne Structural Steel,* 701 F.2d 1221 (7th Cir.1983). "The heavy costs of modern federal litigation ... counsel against launching the parties into pretrial discovery if there is no reasonable prospect that the plaintiff can make out a cause of action from the events narrated in the complaint." *Sutliff,* 727 F.2d at 654.

Based upon these principles, the facts of this case are as follows. The Powells are the beneficiaries of a testamentary trust ("Trust") established by Verne Powell; plaintiff Helen Powell ("Helen") is the income beneficiary, and her sons, plaintiffs F. Verne Powell ("F. Verne"), George M. Powell ("George"), and Andrew K. Powell ("Andrew") are the remainderman benefi-

ciaries. The plaintiffs are all citizens of Michigan, residing in Traverse City, Michigan. The Trust was established at the Marion National Bank, and the Bank and Helen were named co-trustees. In 1978, Marion National Bank dropped its national bank status and became a state bank known as American Bank & Trust Co. ("ABT"). A company known as Marion National was the holding company for both Marion National Bank and ABT. Bell is the Chairman of the Board for ABT, and is the President, Treasurer and director for Marion National.

The corpus of the Trust until August 1984 consisted of sixty shares of common stock in Marion National and 3,499 shares of common stock in ABT (the "Trust stock"). In addition, F. Verne and George individually owned ABT stock, F. Verne owning one hundred eighty-five shares and George owning one hundred eighty-six shares (the "Individual Stock").

For seventeen consecutive sessions of the Indiana General Assembly prior to 1984, attempts had been made to pass legislation allowing cross-county banking, whereby bank holding companies could acquire more than one bank, banks could open branches in contiguous counties, and out of state bank holding companies could acquire Indiana banks and bank holding companies. The concept of cross-county banking was supported by larger Indiana banks, who were represented by the League for Economic Development (League). Smaller banks, represented by the Independent Banking Association of Indiana (IBAI), opposed the concept. The only other major banking organization in Indiana, the Indiana Banking Association (IBA), remained neutral on the subject because its members included both large and small banks. Because of the opposition of IBAI, the attempts at cross-county banking legislation failed in each of the seventeen legislative sessions.

In March 1984, the IBA appointed a committee to examine the issue of cross-county banking and to see whether a compromise between the League and the IBAI could be reached. A compromise was ultimately reached ("the Compromise"), and on June 11, 1984, the IBA directors adopted the Compromise and IBAI announced that it would support the Compromise in the legislature's next session. The June 12, 1984 issues of the *Indianapolis Star* and the *Indianapolis News* both carried stories announcing the Compromise and stating that the Compromise would greatly improve the chances that cross-county banking legislation would be passed in 1985.

In April 1984, prior to the announcement of the Compromise but after the IBA began its efforts to seek a compromise, Helen made two trips to Marion, Indiana to meet with Jack S. Kightlinger ("Kightlinger"), a trust officer at ABT who was responsible for administering the Trust. Kightlinger told Helen that Bell was interested in buying the Marion National stock in the Trust. He told Helen that the price of ABT stock was terribly depressed, and that Bell had recently purchased ABT stock at $20 a share. At the second meeting, Kightlinger told Helen that Bell was willing to buy the Marion National stock in the Trust for $110.10 a share and that he might be interested in buying the ABT stock in the Trust for a price higher than what he had recently paid.

On June 14, 1984, two days after the Compromise had been announced, Bell wrote identical letters on the stationery of Bell Fibre, Inc., a company which Bell owned, to George and F. Verne stating that his family had owned the majority of ABT stock and that there had not been a ready market for the stock. Bell offered to purchase any and all of the stock owned individually by George and Verne.

On June 27, 1984, Bell wrote Helen a letter on Bell Fibre stationery stating that Kightlinger had indicated that Helen had not yet reached a decision on Bell's offer to purchase the Marion National stock for $110.10. Bell described how he had purchased several thousand shares of ABT stock for $20 a share, but that if Helen wished to sell both the Marion National and

ABT stock in the Trust then Bell would pay $110.10 and $25 a share respectively.

Some time between the receipt of the June 27 letter and the end of July, Helen contacted Kightlinger on the telephone and asked him what he thought of Bell's offer. Kightlinger told Helen that he thought the offer was "the very best we [the Trust] can do." The plaintiffs decided to accept Bell's offer, both as to the Trust stock and the individual stock, and Helen wrote Kightlinger a letter to that effect.

On August 9, 1984, Kightlinger wrote Helen on ABT stationery stating that he was in receipt of her letter accepting Bell's offer. Kightlinger wrote that, because of Bell's close affiliation with ABT and Marion National, Kightlinger thought it best to petition the probate court for permission to sell the Trust stock. He enclosed two copies of a "Petition to Sell Corporate Stock" and four waivers. Helen signed both copies of the Petition, and the four plaintiffs each signed a waiver.

In none of the communications between the plaintiffs and Kightlinger or Bell was any mention ever made of the existence or the possible effect of the Compromise on the value of the Trust stock or the individual stock.

On August 22, 1984, the Petition and Waivers were filed in the Grant Circuit Court. The court signed an order approving of the sale of the Trust stock. The order stated that the court read the petition and waivers and "heard evidence thereon." The order also stated that the sale was privately negotiated between the plaintiffs and Bell, and that ABT "played no part in the negotiations." The order also stated that the prices exceeded the market value of the stock, implying that evidence was heard on the value of the stock. In fact, no hearing was ever held before the court; the court simply signed an order which had been prepared by attorneys for the defendants. The order made no mention of the existence or possible effect of the Compromise.

In April, 1985, the Indiana General Assembly passed legislation allowing for cross-county banking in Indiana. The Act became effective on July 1, 1985.

On July 18, 1985, ABT and Summcorp, a bank holding company with its principal place of business in Fort Wayne, Indiana, announced an agreement whereby Summcorp agreed to buy ABT at $90.50 a share. For some time prior to this announcement, ABT had employed a consulting firm to develop merger and acquisition plans for ABT.

The plaintiffs allege six separate counts in their complaint. The first count asserts violations of Rule 10b–5 and the Indiana securities regulation statute, I.C. 23–2–1–19, by all the defendants. The basis of the claim is that the defendants failed to disclose the existence of the Compromise and its possible effect on the value of the Trust stock. The plaintiffs claim that this information was material and that the defendants had a duty to disclose that information, for the plaintiffs would not have sold their stock if they knew those facts. The second count alleges common law fraud against ABT, Bell and Kightlinger for intending to deceive the plaintiffs by failing to disclose the Compromise and its effect. Counts three through five are RICO counts, and differ from each other only in the enterprise identified. Count three alleges that the Trust was an enterprise, count four that ABT was an enterprise, and count five that Bell Fibre was the enterprise. The final count claims that ABT, Bell and Kightlinger had fiduciary duties to the plaintiffs, which were breached by carrying out the sale of the Trust stock without disclosing the Compromise.

The motions to dismiss offer three general arguments against the entire complaint. ABT and Kightlinger claim that the suit is nothing more than an attempt to set aside the judgment of the Grant Circuit Court in a collateral proceeding, and therefore argue that the August 22, 1984 order of that court must be given full faith and credit. Bell and Bell Fibre raise the second argument in their reply brief when they assert that the Grant Circuit Court order was res judicata on the issues in this case. The

final general issue was also raised in Bell and Bell Fibre's reply brief: that the probate exception to federal jurisdiction applies in this case.

As to the individual claims, the defendants argue that, because the fact of the Compromise was published in the *Indianapolis Star* and *Indianapolis News*, the information which the plaintiffs claim should have been disclosed was in the public domain. This, defendants assert, is fatal to all of the plaintiffs' claims. The Rule 10b–5 claim must fail because there is no duty to disclose information in the public domain. The common law fraud claim fails because there can be no fraudulent concealment of information in the public domain. The RICO counts fail because the securities fraud and common law fraud claims fail. Defendants finally argue that the breach of fiduciary duty claim fails as to Bell because Bell had no fiduciary duty to the plaintiffs.

The court will begin by examining the general arguments raised by the defendants and then proceed to the arguments against the individual claims.

■ ABT and Kightlinger raise the first general argument against the complaint. They argue that ABT, with the knowledge and consent of Helen, petitioned the Grant Circuit Court for instructions as trustee, and that the court reviewed the propriety of the sale of the stock and the terms and conditions of the sale, and approved that sale. ABT and Kightlinger argue that the plaintiffs here seek to set aside the order approving the sale, which should be entitled to full faith and credit under 28 U.S.C. § 1738.

ABT and Kightlinger misconstrue the thrust of the plaintiffs' complaint. The Powells do not seek to have the sale of the Trust stock set aside; their prayer for relief does not seek to have the stock returned to the Trust or to F. Verne and George. Rather, the Powells seek to get what they believe to be the full price that should have been paid in August 1984. Far from seeking to set aside the sale approved by the Grant Circuit Court, the Powells

seek to ratify the sale. It is therefore hard to see how a plaintiffs' verdict in this cause would, in ABT and Kightlinger's words, "nullify the Order of the Grant Circuit Court approving the specific transaction." True, a plaintiffs' verdict might entail reaching some factual findings inconsistent with the August 22, 1984 order, but that implicates principles of res judicata, not full faith and credit. Quite simply, the court finds that the complaint in this cause is not a collateral attack on the Grant Circuit Court's order approving the sale of the Trust stock, and that the full faith and credit clause is not implicated here.

■ Even if the complaint was a collateral attack on the August 22, 1984 order, this court would still be able to entertain this lawsuit. The full faith and credit statute requires a federal court to give a prior state court judgment the same preclusive effect as would the courts of the state in which the judgment was rendered. *Krison v. Nehls*, 767 F.2d 344, 347–48 (7th Cir. 1985). The allegations of the complaint are that the August 22, 1984 order was obtained by the submission of a form of order containing untrue factual assertions—for example, that the court heard evidence on the sale and the value of the stock, and that ABT played no part in the negotiations. Under Indiana law, judgments obtained by fraud are open to collateral attack. *See In re Chapman*, 466 N.E.2d 777, 780 (Ind.App.1984). Thus, this complaint could continue because it sufficiently alleges that the defendants obtained the order by virtue of fraud both on the court and on the plaintiffs.

ABT and Kightlinger attempt to get around this general rule by arguing that any fraud committed would have been committed on the Grant Circuit Court, but that such fraud could be negated by the Grant Circuit Court taking judicial notice of the existence of the Compromise when it considered the propriety of the sale of the Trust stock. This argument fails for at least two reasons. First, there is absolutely no evidence currently that the Grant Circuit Court actually did take judicial no-

tice of the existence of the Compromise and how that might affect the value of the Trust stock. If the court was unaware of the Compromise and its effect, then the defendants' failure to bring this fact to the court's attention may well have been a fraud on the court. Second, the complaint also alleges a fraud on the plaintiffs, both in the sale itself and in the procurement of the August 22, 1984 order. An extrinsic fraud—that is, a fraud practiced directly on a party so as to prevent that party from presenting all of his case to the court—which occurs in the procurement of a judgment subjects that judgment to collateral attack. *Scola v. Boat Francis R., Inc.*, 546 F.2d 459, 460–61 (1st Cir.1976). The fraud allegedly worked on the plaintiffs is an independent ground for a collateral attack.

The court therefore finds that ABT and Kightlinger's full faith and credit argument fails.

■ The second argument is somewhat related to the first. Bell and Bell Fibre argue that the August 22, 1984 order is res judicata. The order contained language which stated that the Grant Circuit Court found that the sale of the Trust stock was a bona fide, arms length transaction. Bell and Bell Fibre argue that this language, and the August 22, 1984 order generally, approved the sale and found it to have been proper. The present complaint is viewed as challenging the propriety of the sale, and Bell and Bell Fibre argue that this issue was already decided in the August 22 order. This, Bell and Bell Fibre conclude, is barred by res judicata.

The court concludes that res judicata cannot apply in this case. If the factual allegations of the complaint are true (and the court must so assume for purposes of the motion to dismiss), then the defendants worked a fraud on the plaintiffs by not disclosing the existence of the Compromise or its effect on the value of the Trust stock. By virtue of that fraud, the defendants induced Helen to approve of the submission of the sale to the Grant Circuit Court for approval. In submitting the sale for approval, the defendants committed a

fraud on the court by drafting a petition and a court order which contained false factual assertions. Having defrauded the plaintiffs, the defendants now want to use the court order obtained by that fraud as a bar to the plaintiffs litigating the issues which the fraud effectively prevented any litigation about. To sanction the preclusion of the plaintiffs' claim via res judicata under facts such as these would be to sanction the defrauding of any litigant by an opponent fast enough and shifty enough to get a state court order pertaining to the issues which the innocent litigant seeks to argue before a court. Surely res judicata was not created to protect such fraud upon the courts.

From a constitutional perspective, res judicata is inappropriate under these circumstances. Due process requires the opportunity to be heard at a meaningful time and in a meaningful manner. *Krison*, 767 F.2d at 349. Under the facts as alleged here, the plaintiffs never had an opportunity to be heard by the Grant County Court because of the fraud worked on them by the defendants. The petition seeking the court's approval of the sale was premised on the alleged fraud of the stock sale itself, and the August 22 order was premised on the fraud inherent in submitting a form of order containing false factual statements which the court was induced to sign. To use such a court order to preclude this litigation would be to deprive the plaintiffs of an opportunity to be heard. Such use of res judicata would violate due process.

■ The final general argument pertains to the so-called "probate exception" to federal jurisdiction. Courts have recognized that cases involving probate matters—the probate of a will or the administration of an estate—may be matters over which federal courts should not take jurisdiction. *See Loyd v. Loyd*, 731 F.2d 393, 396–97 (7th Cir.1984); *Dragan v. Miller*, 679 F.2d 712, 713–14 (7th Cir.1982), *cert. denied*, 459 U.S. 1017, 103 S.Ct. 378, 74 L.Ed.2d 511 (1983). The court finds that this exception does not apply in this case for at least three reasons. First, both *Loyd* and *Dra-*

*gan* indicate that the probate exception applies to diversity jurisdiction; there is nothing to suggest that a federal court cannot take jurisdiction over a federal question raised by a plaintiff. Here, four of the six claims are federal statutory claims, and the court certainly can take jurisdiction over these. Second, there is nothing to suggest that this case involves the probate of a will or the administration of an estate. The complaint does not seek to enjoin any probate proceedings or reach property in the hands of the state court. The *Dragan* court found that a complaint such as this does not ask the federal court to probate a will or administer an estate, nor does it seek to interfere with probate proceedings or assume general jurisdiction over the probate and property in custody of the state court. 679 F.2d at 713. Finally, the probate exception does not deny this court of jurisdiction, but rather leaves such jurisdiction to the court's discretion. As the Seventh Circuit stated in *Loyd:* "We simply do not think the exception is a hard and fast jurisdictional rule." 731 F.2d at 397. The court finds that the probate exception does not apply in this case, both because federal question jurisdiction exists and because this cause does not involve any interference with the probate of a will or the administration of an estate.[1]

The court therefore finds that it has complete jurisdiction over the plaintiffs' claims. It now proceeds to examine the arguments of the motions to dismiss directed to the individual claims raised in the complaint.

At the May 23, 1986 hearing, defense counsel admitted that the challenges to the six counts in the complaint all hinged on the proposition that the June 12, 1984 articles in the Indianapolis newspapers placed the information of the Compromise in the public domain, thereby relieving the defendants of any duty to disclose it. However, the argument takes slightly different forms under the different counts, and so the court will analyze each count separately.

### 1. Securities Law Claims

The plaintiffs contend that the failure to disclose the existence and effect of the Compromise violated the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and the Indiana statutes governing securities, I.C. 23–2–1–19. The parties agree that the state law claim is governed by the case law interpreting the federal statute and Rule 10b–5.

Rule 10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(a) to employ any device, scheme, or artiface to defraud,

(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

---

**1.** This case has at best a tangential connection to the administration of an estate. The essence of the complaint is that the defendants defrauded the plaintiffs in a stock sale; it just so happens that the stock was the corpus of a testamentary trust. Yet because the plaintiffs do not seek to rescind the sale, but rather want only to get the value of the stock which they were not paid, there is no interference with the Grant Circuit Court's administration of the Trust. This certainly differs greatly from the kinds of cases discussed in *Dragan,* where the probate exception might be appropriate in a case where the plaintiffs seek to set aside a will or refashion the distribution of estate assets.

Bell and Bell Fibre attempt to bring this case within the ambit of the exception by citing *Princess Lida of Thurn and Taxis v. Thompson,* 305 U.S. 456, 59 S.Ct. 275, 83 L.Ed. 285 (1939), for the proposition that the administration of a trust falls within the exception. The case does not stand for such a proposition. There, the Supreme Court ruled that the district court did not have jurisdiction over a suit seeking the same relief as that sought in a state court's administration of a trust. Here, the relief sought is completely different, and there will be no interference with the jurisdiction or control over the Trust exercised by the state court. The court finds that the probate exception is simply inappropriate here.

(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

This rule makes it unlawful to misrepresent or fail to disclose material information in connection with the purchase or sale of securities. *Michaels v. Michaels,* 767 F.2d 1185, 1194 (7th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 797, 88 L.Ed.2d 774 (1986). The Powells contend that the failure of the defendants to inform them of the existence or effect of the Compromise is a violation of this rule.

Bell and Bell Fibre make a weak attempt to argue that the Compromise was not a material fact. They argue that, because Helen visited Marion, Indiana in April 1984 and Bell's offer for the Trust stock was communicated at that time, the offer occurred before the Compromise was announced, and so the Compromise could not have been a material fact. The argument fails for two reasons. First, the sale itself did not occur until August 1984, two months after the Compromise was announced. Assuming that the Compromise would have had some effect on Helen's decision to accept Bell's offer (which the Powells assert it would have), then the Compromise would have become material during the course of the negotiations of the sale. The materiality of information misstated or withheld is determined in light of what the defendants knew at the time the plaintiff committed himself or herself to sell the stock, *Michaels,* 767 F.2d at 1194, not when the offer was first made.

Second, there are sufficient factual allegations to establish that the Compromise was a material fact. The *Michaels* court stated: "For purposes of section 10(b) and Rule 10b–5, an omission or misstatement is material if there is a 'substantial likelihood that, under all the circumstances, the omitted [or misstated] fact would have assumed actual significance in the deliberations of the reasonable shareholder.'" 767 F.2d at 1194, quoting *TSC Industries, Inc. v.*

*Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). The test for materiality is an objective one, *TSC Industries,* 426 U.S. at 445, 96 S.Ct. at 2130; the court must determine the significance of the information from the perspective of a reasonable shareholder. *Id.; Kademian v. Ladish Co.,* 792 F.2d 614, 623 (7th Cir.1986). The plaintiffs have alleged that the struggle for cross-county banking in Indiana has a long history; seventeen consecutive attempts to pass legislation allowing it were defeated by the efforts of the smaller banks in the state, represented by the IBAI. This history suggests that the larger banks in the state felt they had something to gain by cross-county banking, and the smaller banks felt they had something to lose. Thus, the Compromise was a significant breakthrough which indicated at least the possibility that the banking environment in Indiana would change. Given the fact that the traditional opponent of cross-county banking (the IBAI) announced it would support the legislation indicated that such legislation would have an excellent chance of passing.

What significance would the passage of such legislation have on a reasonable investor? The ability of holding companies to buy banks or to own more than one bank would mean that there was a possibility that large holding companies would be looking to buy up banks. That would have the potential to increase the value of the stock both of the acquiring company and the acquired bank (the alleged increase in the value of ABT stock, from $20 a share to $90.50 a share, is a dramatic example of this effect). The ability of banks to open branches in contiguous counties would affect the competitive environment, which could have an effect on bank performance and ultimately stock values. Admittedly, what would happen to a particular stock would be hard to predict, but it seems clear that some change in the banking industry would occur; few banks would be unaffected by the changing environment around them. Thus, a reasonable investor about to sell bank stock at the time the Compromise was announced would probably attach

considerable significance to the Compromise because the market's valuation of his bank stock which existed before the Compromise might now be obsolete in light of the pending changes in the industry. The court therefore concludes that, under the objective test for materiality, the Compromise is a material fact.

In an extremely tardy brief to the court, Bell and Bell Fibre attempt to bring this case within the parameters of the rule set forth in *Guy v. Duff & Phelps, Inc.*, 628 F.Supp. 252 (N.D.Ill.1985), and *Jordan v. Duff & Phelps, Inc.*, Fed.Sec.L.Rep. Par. 92,724 (CCH) (N.D.Ill.1986) [Available on WESTLAW, DCTU database]. In both cases, the plaintiffs sued for the failure to disclose that acquisition negotiations for Duff & Phelps were underway. In *Guy*, the court followed the reasoning of the Third Circuit in *Greenfield v. Heublein, Inc.*, 742 F.2d 751 (3d Cir.1984), *cert. denied*, 469 U.S. 1215, 105 S.Ct. 1189, 84 L.Ed.2d 336 (1985), and the Second Circuit in *Reiss v. Pan American World Airways*, 711 F.2d 11 (2d Cir.1983). Those cases held that there is no duty to disclose "mere negotiations" for a merger or acquisition, and that the duty to disclose does not arise until there is an "agreement in principle" on the price and structure of the deal. *Greenfield* went as far as to say that "preliminary merger discussions are immaterial as a matter of law." 742 F.2d at 756. Bell argues that this rule applies to the present case because there was no merger agreement with ABT until a year after the sale of the Trust stock.

Bell and Bell Fibre's argument fails because the principles behind the rule of *Greenfield* and *Reiss* do not apply here. As the *Reiss* court stated in justifying its ruling:

> such (preliminary negotiations are inherently fluid and the eventual outcome is shrouded in uncertainty. Disclosure may in fact be more misleading than secrecy so far as investment decisions are concerned. We are not confronted here with a failure to disclose hard facts which definitely affect a company's financial

prospects. Rather, we deal with complex bargaining between two (and often more) parties which may fail as well as succeed, or may succeed on terms which vary greatly from those under consideration at the suggested time of disclosure.

711 F.2d at 14. The concern was that requiring disclosure during preliminary negotiations greatly increased the chances of 10b–5 litigation because the uncertainty of both the success and the terms of the deal. For example, if the negotiations were disclosed at the preliminary stage, the value of stock in the target company would increase. If the deal fell through, then shareholders who bought when the price was high because of the merger rumors would sue, claiming the disclosure was misleading. If the terms of the deal were substantially different than when it was first announced, shareholders could sue because of the misleading nature of the disclosure itself. In order to prevent against litigation under almost every merger scenario, the *Greenfield* and *Reiss* courts approved the prophylactic rule that there was no duty to disclose preliminary negotiations.

Under the facts of this case, however, the uncertainty is of a much different kind. In a merger situation, a company may be affected (if the merger goes through) or it may not be (if the deal falls through). Release of the information at the preliminary negotiation stage promotes buying and selling action over what may turn out to be no change at all. Here, however, a reasonable shareholder would conclude that the Compromise signalled a highly probable (one might even say relatively certain) change in the banking industry because it removed the impediment to cross-county banking (the opposition of the IBAI). Thus, the uncertainty was not whether some change in a stock's value would occur, but rather how much of a change. It is certainly true that at the time of the August 1984 sale the final details of the banking law were not yet finalized, and that the ABT–Summcorp merger was not completed. However, the impending changes in the banking industry heralded by the Compro-

mise were enough to make the Compromise material to a reasonable investor.[2]

The defendants attempt to argue that, even if the information concerning the Compromise was material, they had no duty to disclose it because it was in the public domain. They point to the June 12 issues of the *Indianapolis News* and *Indianapolis Star*, which carried stories announcing the Compromise, and take the position that once a story or fact is distributed by the media, it is in the public domain because it is available to the public. Once in the public domain, the defendants conclude, there is no duty to disclose a material fact.

The defendants support their argument by examples. The heaviest emphasis is on *Johnson v. Wiggs*, 443 F.2d 803 (5th Cir. 1971). In that case, Wiggs offered to buy Johnson's shares in Western Reserve Corp. and the corresponding right to receive Continental Fidelity Insurance Co. stock, the primary asset of Western Reserve. Wigg made several offers over the course of two months, the last offer being for 79¢ a share. On March 20, 1968, Johnson authorized his accountant to sell his 50,000 shares of Western Reserve and the rights to the Continental Fidelity stock for $17,-500, or about 35¢ a share. Prior to March 20, Western Reserve acquired 72% of the stock of Universal Computa-Data Corp. The acquisition was made public in articles appearing in two Dallas newspapers (Johnson's accountant, Tyler, practiced in Fort Worth) on March 14, was discussed on a Dallas television station, and was the subject of a letter sent to all shareholders by Western Reserve's president, a letter the court found would have reached Johnson before his decision to sell. In addition, the letter mentioned that the price of Western Reserve stock had risen to $1.00 a share, and the price of the stock was available to investors through "National Daily Quotation Sheets," or "pink sheets," used by stockbrokers. The *Johnson* court stated:

> Wiggs was entitled to assume that Johnson, Western Reserve's second largest shareholder, and Tyler, his financial advisor, were aware of both the acquisition of Universal ComputaData, and the "pink sheet" quotes of the stock on March 25, 1968, when Johnson made his offer to sell. The information was in the public domain. The acquisition was previously reported in the area newspapers, and on a local television station which gave financial news ... This being so, there was no duty or obligation on the part of Wiggs to disclose. He was not required to say that which had been publicly proclaimed in several ways on several occasions.

443 F.2d at 806.

A second case cited by the defendants is *Seibert v. Sperry Rand Corp.*, 586 F.2d 949 (2d Cir.1978). That case involved a suit to set aside a director's election because the proxy statement describing the company's slate of candidates failed to disclose that the director was also a director of J.P. Stevens, a company known for its labor

---

**2.** The defendants complained at oral argument that it would be unfair to require them to disclose any facts because the announcement of the Compromise itself did not indicate what the details of the final legislative product would be, so that it would be impossible to determine what effect cross-county banking would have on ABT or Marion National stock. Yet what is important to remember is that materiality looks at factors which a reasonable shareholder would consider important. Changes in the business environment in which a particular business operates can be very significant to assessing whether a particular stock price is good if for no other reason than it makes less certain the accuracy of the market's price prior to the environmental change. Admittedly, the details of the cross-county banking law were not finalized at the time of the sale; however, a reasonable shareholder would have considered the Compromise material because it would make the $20 a share price Bell had been getting less of an accurate measure of the stock's value given the high probability of impending change in the banking industry. The court believes that the defendants' complaint here is more of an argument directed towards the Powells' damages— what change in value of the stock was wrought by the mere announcement of the Compromise? But on the issue of materiality, the announcement of the Compromise must be considered material because of the changes in the industry it foreshadowed.

disputes. The court found that there was no duty to disclose the fact of the director's involvement with J.P. Stevens because the labor difficulties "were reported country-wide in the press and on radio and television, were discussed in Congress, and were analyzed in published administrative and judicial opinions; that a nationwide consumer boycott was being conducted against Stevens, accompanied by massive media advertising." The court concluded that "[c]learly, all this was information already in the public domain," 586 F.2d at 952, and thus Sperry Rand had no duty to disclose it.

As the plaintiffs correctly point out, the defendants here fail to articulate a standard for courts to apply in determining when a duty to disclose no longer exists because the information is public. The position taken in the defendants' briefs appears to be that once information becomes public, the duty disappears. Apparently, the defendants focus on the "inside" nature of the information; once the information is no longer "inside" (that is, known only to insiders), there is no duty to disclose.

An examination of the cases discussing the duty to disclose in the context of public disclosure of material information do not focus on an "inside-outside" dichotomy. Rather, the overriding principle seems to be one of reasonableness. Perhaps the most cited case in this general area is *Myzel v. Fields*, 386 F.2d 718 (8th Cir.1967), *cert. denied*, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968), which was cited by the *Seibert* court. *Myzel* holds that "there is no duty to disclose information to one who reasonably should already be aware of it." 386 F.2d at 736. Subsequent courts have recited this rule numerous times. *See e.g., Seibert*, 586 F.2d at 952; *City Nat'l. Bank of Fort Smith, Ark. v. Vanderboom*, 422 F.2d 221, 231 (8th Cir.), *cert. denied*, 399 U.S. 905, 90 S.Ct. 2196, 26 L.Ed.2d 560 (1970); *E.F. Hutton & Co., Inc. v. Penham*, 547 F.Supp. 1286, 1296 (S.D.N.Y. 1982); *Eriksson v. Galvin*, 484 F.Supp. 1108, 1126 (S.D.N.Y.1980).

Other courts state this reasonableness requirement in different ways. Some view it in terms of the reasonableness of the defendants' belief: "A party's 'reasonable belief that the other party already has access to the facts should excuse him from new disclosures which reasonably appear to be repetitive.'" *Seibert*, 586 F.2d at 952, quoting *Frigitemp Corp. v. Financial Dynamics Fund, Inc.*, 524 F.2d 275, 282 (2d Cir.1975). *See Kirkland v. E.F. Hutton & Co., Inc.*, 564 F.Supp. 427, 441 (E.D. Mich.1983) (question of fact exists whether defendants "reasonably could have expected plaintiff to discover this information on his own"). Other courts do not use the term "reasonableness," but require that the facts of the case suggest what can only be described as "reasonable access" to the information: that the information is "equally available" to both parties, (*see Seibert*, 586 F.2d at 952, quoting *Hafner v. Forest Laboratories, Inc.*, 345 F.2d 167, 168 (2nd Cir.1965); *B. Rosenberg & Sons, Inc. v. St. James Sugar Co-op*, 447 F.Supp. 1, 5 (E.D.La.1976, *aff'd*, 565 F.2d 1213 (5th Cir.1977)); that the information was "easily available" to the plaintiff, (*see City Nat'l. Bank of Fort Smith Ark.*, 422 F.2d at 231; *Klamberg v. Roth*, 473 F.Supp. 544, 552 (S.D.N.Y.1979)); or that the facts are things about which the plaintiff is "presumably uninformed" (*see Kohler v. Kohler*, 319 F.2d 634, 642 (7th Cir.1963)).

■ The court concludes that the best rule to apply here can be summarized as follows: a public disclosure of information relieves the duty to disclose if it is reasonable to conclude that the plaintiff should have been made aware of the fact as a result of that disclosure. This rule distills the different case holdings summarized above. It gives a methodology to the *Myzel* rule by requiring a court to examine whether the disclosure was such the plaintiff "reasonably should be aware" of a particular fact. It incorporates the tests involving the examination of the defendant's belief about the plaintiff's knowledge, as the "reasonable to conclude that the plaintiff should have been made aware"

aspect of the rule is simply another way of asking the question of whether the defendant reasonably believed the plaintiff knew. The "equally available," "easily available," and "presumably uninformed" standards are all subsumed within the reasonableness aspect of this test.

The "reasonably should have been made aware" aspect of this rule implicitly rejects the defendants' position that any publication of information relieves the duty to disclose. *Johnson v. Wiggs* and *Seibert v. Sperry Rand* are not good examples to use here precisely because the publication in those cases was rather significant; *Seibert* involved nationwide, extensive coverage of the facts, while *Johnson* involved repeated exposure in the local media, a letter sent to the plaintiff, and the availability of information in stock brokerage houses which the plaintiff had evidently used in the past. With such extensive dissemination of the information, a court would readily conclude that the plaintiff should have been made aware of the information by these disclosures, and therefore (under the rule set forth here) the duty to disclose was relieved. What the defendants' position here would allow, however, is the clearly unreasonable situation of the duty to disclose being relieved by publication through means that could not reasonably get the information to the plaintiff. Suppose, for example, that a material fact about a company's financial situation is published in a small town newspaper in California. Is an investor in New York thereby precluded from bringing a 10b–5 action merely because the information was made public *somewhere?* The defendants here would apparently contend that the New York plaintiff would be out of luck. Such a narrow view of a defendant's liability would be inconsistent with the policies behind the securities laws, as it would allow defendants to take advantage of uninformed persons. It is more consistent with those policies to make defendants liable unless it is reasonable that the disclosure should have made the plaintiff aware of the facts.[3]

The issue here is whether the publication of a story about the Compromise in the two Indianapolis newspapers reasonably should have made the plaintiffs aware of the existence of the Compromise. It should be noted that there was no other public disclosure of the Compromise (at least under the facts as alleged in the complaint), and the publication occurred only once. The court finds that it is not reasonable to conclude that these solitary instances of publication would have made the Powells aware of the Compromise. The plaintiffs live in Michigan; Helen, the plaintiff most actively involved in the negotiation of the Trust stock sale, lived in Traverse City, Michigan, which is located several hundred miles from Indianapolis. Although there has been no evidence concerning the circulation of the Indianapolis newspapers, the great distance of the plaintiffs from Indianapolis suggests that it is highly unlikely that they would have seen the stories about the Compromise. On the facts now before the court, the publication of the two stories, by themselves, cannot reasonably be expected to have made the plaintiffs aware of the Compromise. Therefore, the publication of the newspaper articles does not relieve the defendants' duty to disclose the fact of the Compromise.

This conclusion also undermines the defendants' other arguments against the securities law claims. The defendants claim that they did not have to reveal their speculation or opinion about the effect of the Compromise *because the Compromise was disclosed or already known.* Because the court finds that the Compromise was not disclosed to the plaintiffs, this argument fails. Possible effects or occurrences can be material facts, *SEC v. MacDonald*, 699 F.2d 47, 50 (1st Cir.1983). Although the

---

**3.** Admittedly, the rule adopted by the court has some of the characteristics of due diligence, an issue which, although discussed by the plaintiffs, is not germane to this case at this time. The rule merely requires the court to ascertain whether it is reasonable to believe that a particular public disclosure should have made the plaintiffs aware of certain facts. The defendants here will still have the chance to prove that the plaintiffs did not exercise due diligence.

certainty of the eventual occurrence of an event may have been greater in *Mac-Donald* than it was in this case, there was nevertheless a significant probability that cross-county banking would become a reality in the next legislative sessions. The main opponent of the legislation, the IBAI, had announced that it would support the Compromise, thereby removing the impediment to the last seventeen attempts to pass such a law. Further, while the exact details of the legislation would not be known, the general concepts of cross-county banking suggests probable general features of the law, from which an investor might make certain decisions about the changes pending in the banking industry. That is certainly sufficient to warrant disclosure, especially when the plaintiffs could not reasonably have been expected to know of the Compromise.[4]

The court therefore finds that the motion to dismiss the securities law claims must fail.

### 2. Common Law Fraud

■ The second count of the complaint alleges that the defendants engaged in fraud in the sale of the Trust stock. The defendants try to argue that, under Indiana law, the Powells must show that the defendants owed a duty to them, and that the publication of the information about the Compromise relieved the defendants of any duty. The Powells, almost casually, suggest the possibility that Michigan law applies here because the Powells are residents of Michigan. Because the plaintiffs are all diverse from the defendants, this fraud count is based on diversity of citizenship, and therefore the court must determine which state law applies here.

In resolving a conflict of laws question, a federal court sitting in diversity will generally apply the choice of law rules of the state in which it sits. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In Indiana, the choice of law rule for torts is the rule of *lex loci delicti*—that is, the law of the place where the tort was committed. *Western Smelting & Metals v. Slater Steel, Inc.*, 621 F.Supp. 578, 582 (N.D.Ind.1985); *Eby v. York Division, Borg Warner*, 455 N.E.2d 623, 626 (Ind.App.1983). While the plaintiffs stated this half of the choice of law equation correctly, they completely misread the *Eby* case as applying a "most significant contacts" test to a tort claim like fraud. As this court made clear in *Western Smelting*, "Under this rule [*lex loci delicti*], the place where the tort was committed ... is 'the state where the last act necessary to make an actor liable for an alleged tort takes place.'" 621 F.Supp. at 583, quoting *Restatement of Conflicts of Laws*, § 377 (1934). For claims of fraud, the tort is considered to have been committed in the state where the loss occurred. 621 F.Supp. at 583.

Where did the losses complained of in this case occur? With the Individual stock, the answer is easy: the loss occurred in Michigan, where F. Verne and George live, as that is where the "economic impact" of the fraud occurred. *See Western Smelting*, 621 F.Supp. at 583–84. Thus, Michigan law should apply to the aspect of the fraud claim pertaining to the individual

---

4. Although the court has spoken primarily about the failure to reveal the existence or effect of the Compromise, there is also an issue of the need to reveal material facts which would make the statements of the defendants not misleading. ABT, through Kightlinger's agency, can be held liable for failing to reveal the Compromise in order to make Kightlinger's statement in July 1984 (one month after the Compromise was announced) that Bell's offer was "the best we could do" not be misleading. Bell's statements, on Bell Fibre's stationery, that there was no ready market for the ABT stock and that it had been $20 a share in previous transactions made his $25 a share offer sound attractive. The failure to reveal the Compromise might make those statements misleading because the value of the stock may in fact have been greater, or at least affected, by the existence of the Compromise. Thus, even if the defendants were not required to reveal "speculations or opinions" about the effects of the Compromise, the facts alleged here indicate that they nevertheless failed to reveal material facts such that they could be liable under federal and state securities law.

stock. The question of where the loss occurred with respect to the Trust stock, however, is much more difficult. The co-trustees, which had the legal title to the Trust stock, were located in Indiana and Michigan. The remaindermen lived in Michigan. When the stock was sold, who suffered the loss—the trustees or the remaindermen?

It is certainly true that the remainderman interest is always damaged when the assets of a trust are damaged by a fraud—the interest is smaller because the fraud has deprived the trust of a certain amount of value. It is also true that the trustees hold legal title to the trust corpus, and generally are the only ones who may sue for wrongful acts committed against the trust property. *See* Bogert, *Trusts and Trustees*, §§ 869, 954 (2d ed. rev. 1982). However, Bogert also suggests that, when a wrongdoing trustee acts collusively with the wrongdoer who harms the trust corpus, then the beneficiaries have a cause of action both against the wrongdoing trustee for breach of the trust and against the wrongdoer. *Id.* at § 955. Thus, beneficiaries may sue to protect their interest in the trust, and the court assumes that this is precisely what the Powells are doing here. If so, then where the beneficiary is would be the place where his or her interest suffers a loss when a fraud is committed on trust assets; the "economic impact" on the beneficial interest is felt by the beneficiary, not the trustees, and thus it is most accurate to say that the loss is suffered where the beneficiary resides. Therefore, the court looks to the states where the beneficiaries live as the place where the loss occurs, and thus the law to apply here. All the plaintiffs reside in Michigan, and so Michigan law must apply.

Under Michigan law, "fraud is an intentional perversion or concealment of the truth for the purpose of inducing another in reliance upon it to part with some valuable thing or to surrender a legal right." *Eaton Corp. v. Easton Assoc., Inc.*, 728

F.2d 285, 292 (6th Cir.1984), quoting *Barkau v. Ruggirello*, 113 Mich.App. 642, 647, 318 N.E.2d 521 (1982). To sustain an action for common law fraud under Michigan law it must appear that (1) there was a material misrepresentation by the defendant that was false; (2) the defendant knew that it was false when he made it or made it recklessly without any knowledge of its truth and as a positive assertion; (3) the defendant made it with the intention that it should be acted upon by the plaintiff; (4) the plaintiff acted upon it and (5) thereby suffered injury for which he sues. *Eaton Corp.*, 728 F.2d at 292; *United States v. Cripps*, 460 F.Supp. 969, 975 (E.D.Mich. 1978).

As to ABT and Kightlinger, the court concludes that the Powells have sufficiently alleged facts to support a claim for fraud under Michigan law. The complaint asserts that Kightlinger told Helen that Bell's offer was "the best we could do" over a month after the Compromise was announced. The thrust of the complaint is that this statement was false and materially misleading, and was intended to induce the Powells to sell their stock. That is an adequate allegation of "intentional concealment" to satisfy Michigan law at the pleading stage. The argument that the information was public, and therefore the defendants did not have to reveal it to the Powells, is refuted by the court's analysis above that the information about the Compromise was not in the public domain for purposes of federal securities law.

The court concludes that the complaint adequately alleges a fraud claim against Bell and Bell Fibre as well. Bell's letters, on Bell Fibre stationery, asserted that there was no ready market for ABT stock, and were written in such a way that the $25 a share offer for the ABT stock was well above the market price, thus making Bell's offer appear quite good. The Powells maintain that the Compromise changed the market value of the stock, and that Bell's failure to mention the Compromise

was an intentional misstatement of the stock's value designed to induce the Powells to sell. Again, that seems sufficient to state a claim of "intentional concealment of the truth."

■ Bell maintains that he owed no duty to disclose any information to the plaintiffs because, although he was a corporate director of ABT, he was trading for his personal account. There is some question whether a fraud claim in Michigan hinges on the existence of a duty to disclose; Bell's argument about duty is based on Indiana law. The argument appears to be premised on the assumption that Bell made no statements, and thus the only fraud which might have been worked by him was committed by silence. Even if the court assumes that Bell made no affirmative misstatements, and thus a duty to disclose is an essential element of a fraud claim against a corporate director like Bell, such a duty could be found here. Under Michigan law, the general rule is as follows:

> Directors, of course, stand in a fiduciary relation to the corporation itself. They do not stand in that relation, however, when dealing with other stockholders for the purchase or sale of stock. In the purchase or sale of stock between stockholders there must be some actual misrepresentation in order to constitute a fraud. Mere silence is not sufficient.

*Buckley v. Buckley,* 230 Mich. 504, 202 N.W. 955, 956 (1925). However, this rule

> is subject to modification in certain exceptional circumstances ... A principle underlying the general rule is that the books of the corporation are open to all stockholders alike, and each may inform himself of the condition of the company. The special circumstances producing exceptional cases seem to be an assumed sale, merger, *or other fact or condition enhancing the value of the stock, known by the officer or officers, not known by the stockholder, and not to be ascertained by an inspection of the books.*

*Id.,* 202 N.W. at 956 (emphasis supplied). *See also Backus v. Kirsch,* 264 Mich. 339, 249 N.W. 872, 873 (1933).

The court concludes that this case falls within the "exceptional circumstances" emphasized above. Michigan law appears to place no duty on a corporate director trading for his own private account unless that director gives some information to the selling shareholder. However, possession of information which is not ascertainable from the books of the corporation places a duty on the director to disclose that information, much like the federal securities law requires disclosure. Thus, Michigan recognizes a very narrow area in which a corporate officer or director is free from the duty to disclose information. Here, Bell is alleged to have known material information—the existence of the Compromise—which would not be ascertainable from the books of ABT. Therefore, he had a duty to disclose the information, and thus could be subject to a common law action for fraud.

The court concludes that the motion to dismiss the second count fails as to all defendants.

### 3. RICO Counts

■ The primary thrust of the defendants' attack against the RICO counts is that the Powells have failed to allege anything constituting a "racketeering activity" so as to support the RICO claims. RICO makes it unlawful for a person to receive income from a "pattern of racketeering activity," 18 U.S.C. § 1962(a), where a "pattern" is the commission of two or more acts of "racketeering activity." Section 1961(1) defines racketeering activity as including "fraud in the sales of securities." 18 U.S.C. § 1961(1)(D). Because the court has already ruled that the Powells have stated a claim under federal and state securities law, there is a claim of at least two acts of fraud in the sales of securities (fraud in the sale of the Trust stock and in the individual sales of F. Verne and George). Therefore, the plaintiffs have adequately stated a claim under RICO.

Thus, the motion to dismiss these counts must be denied.

### 4. Breach of Fiduciary Duty Claim

The sixth count of the complaint alleges that ABT, Kightlinger and Bell breached fiduciary duties owed to the plaintiffs. The only challenge here is by Bell, relying on the rule under Indiana law that a corporate officer purchasing stock for his personal account is under no duty to the seller. As the court above held, Bell owes a duty to the plaintiffs under Michigan law, and thus the breach of fiduciary duty claim cannot be dismissed as to Bell.

### Conclusion

For the reasons set forth above, the defendants' motions to dismiss are hereby DENIED in all respects.